In the Matter of the Estate of DAVID R. FISH, Deceased. LORENA RANDALL et al., Appellants; JEANETTE SCHAFEN-BERG et al., Respondents.

Third Department, December 30, 1987

APPEARANCES OF COUNSEL

*Theodosis J. Totolis (Peter A. Daniels* of counsel), for appellants.

*Butler, Allen & Clark (David M. Brown* of counsel), for respondents.

OPINION OF THE COURT

LEVINE, J.

On May 14, 1980, decedent, aged 62, while a patient at Syracuse Veterans' Administration Hospital under treatment for rheumatoid arthritis, executed an instrument purporting to be his last will and testament. The will was drawn at the hospital by an attorney who met decedent for the first time on the day of execution, and was witnessed by the wife of decedent's brother Roy and by a physician who was a medical resident at the hospital but had not treated decedent. The will left 60% of decedent's estate to his sister Lorena, 22% to his brother Roy and divided the balance equally between his other six brothers and sisters. Decedent left an estate of some $107,000. This comprised the assets held in a fiduciary account by the Marine Midland Bank in Broome County, a successor committee for decedent.

The uncontested evidence established that decedent had suffered mental impairment as a result of combat duty in the United States Army during World War II in Africa. He was hospitalized in Veterans' Administration Hospitals for this condition from 1943 to 1959. A committee to handle his finances was appointed pursuant to an ex parte application based upon incompetency in 1944, and continued to act as such until decedent's death in 1984. Decedent lived with his mother from 1959 until she died in 1962. He lived for several months alone and then moved in with his sister Lorena, with whom he resided until his death. Lorena died before the jury trial of the instant will contest which was the result of objections filed by decedent's remaining siblings, who had only received minor shares of his estate under the will.

Probate of decedent's will was denied on the ground of his lack of testamentary capacity. This in turn was based upon the trial jury's negative response to one of several questions submitted to it, namely, at the time of execution "was [decedent] aware of the nature, extent and condition of his property?" Petitioners contend that reversal is required because this finding was unsupported by the evidence and was incon-

sistent with the jury's other findings, also in response to framed questions, that decedent (1) understood that he was making a will disposing of his property and the terms thereof, and (2) recalled the persons who were the natural object or objects of his bounty.

The decree denying probate should be affirmed. Surrogate's Court's submission to the jury, to which petitioners took no exception, was consistent with the settled law that testamentary capacity requires examination of three factors: " '(1) whether [the testator] understood the nature and consequences of executing a will; (2) whether [the testator] knew the nature and extent of the property [he] was disposing of; and (3) whether [the testator] knew those who would be considered the natural objects of [his] bounty and [his] relations with them' " (*Matter of Kumstar*, 66 NY2d 691, 692, quoting *Matter of Slade*, 106 AD2d 914, 915; *see also*, PJI 7:48). While a testator need not have precise knowledge of the size of his estate (*see, Matter of Bush*, 85 AD2d 887, 888), the authorities clearly hold that a testator's lack of awareness of or ability to keep in mind without prompting the general nature and extent of one's real and personal property requires denial of probate (*see, Matter of Delmar*, 243 NY 7, 14-15; *Matter of Slade, supra*, at 915-916; *Matter of Flynn*, 71 AD2d 891, 892).

Where there is conflicting evidence or the possibility of drawing conflicting inferences from undisputed evidence on this or any other issue determinative of testamentary capacity, the issue is one of fact for the jury (*Matter of Kumstar, supra; Matter of Delmar, supra; Matter of Flynn, supra; see, Matter of Morrison*, 270 App Div 552, 554, *affd* 296 NY 652). A review of the record reveals that such is the case here. There was competent evidence that decedent suffered "shell shock" during the war and as a result had been hospitalized for his continued mental impairment for the next 16 years. A sister, brother and brother-in-law who had regular, periodic contact with decedent throughout the years after his discharge from the hospital, including the several years immediately preceding and subsequent to his execution of the will, described decedent as docile, uncommunicative and childlike in his behavior. Except for a brief period following his mother's death, decedent never lived alone. Again, except for one short occasion, decedent never held employment. Other than furnishing decedent with pocket money of $50 twice a month, the bank acting as his committee entirely handled decedent's

financial affairs, disbursing directly for the payment of all but decedent's minor expenditures. The physician who treated decedent for arthritis on a monthly basis from some 2½ months after the execution of the will until his death some four years later, rendered an opinion that decedent suffered throughout the period from severe mental impairment such as to require continued supervision and to render him totally unable to handle his own financial affairs. A psychiatrist who had not seen decedent, but who testified on the basis of a hypothetical question which accurately described the testimony concerning decedent's lengthy hospitalization for mental problems stemming from his wartime experiences and his behavior and demeanor thereafter, opined that decedent was suffering from chronic schizophrenia.

From the foregoing evidence, the jury certainly could rationally have concluded that decedent did not know and was incapable of holding in his mind the nature, extent and condition of his property, despite the fact that there was conflicting evidence which could have supported the opposite conclusion. This being so, the determination by the triers of fact should not be disturbed (see, Matter of Morrison, supra, at 555).

We are likewise unpersuaded that any fatal inconsistency exists between the jury finding challenged here and the jury's findings that petitioners satisfied their burden of proof on the two other factors determinative of testamentary capacity. Each factor is a discrete element of competency to make a will, and the jury's verdict was entirely consistent with the quantum of petitioners' proof as to each factor.

HARVEY, J. (dissenting). We respectfully dissent. It is the strong public policy of this State not to lightly set aside a decedent's last will (Rohan, 1986 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 17B, EPTL 3-1.1 [1988 Pocket Part], at 29). Decedent's will was duly executed, acknowledged and attested to by two subscribing witnesses. Prior to executing the will, a medical doctor performed a "mental status" examination on decedent. The doctor testified at trial that decedent performed the test satisfactorily. The attorney who drafted the will, who could have knowingly testified as to whether decedent was aware of the nature of his estate, predeceased decedent. The sister with whom decedent lived and who was thus most likely to have known and understood decedent's mental ability also died before trial.

Decedent was a combat veteran of World War II who suffered service-connected psychological injury. Despite the apparent personality disorder resulting from his military service and the speculative testimony regarding the effect of this on his competency, the jury found that decedent understood the nature and consequences of his will, knew the natural objects of his bounty, was of sound mind and memory and competent to dispose of his estate. None of these findings are disputed.

It is, of course, well established that factors to be considered in determining testamentary capacity include (1) whether the testator understood the nature and consequences of executing a will, (2) whether he knew the nature and extent of his property, and (3) whether he knew the natural objects of his bounty and his relations with them *(see, e.g., Matter of Kumstar,* 66 NY2d 691, 692). While a court must look to these factors when considering capacity *(supra; Matter of Slade,* 106 AD2d 914, 915), they are "but rough guides" and each case must be decided upon its particular facts and circumstances (2B Warren's Heaton, Surrogates' Courts § 186-c [1] [c], at 32-238 [6th ed]; *see, Matter of Horton,* 26 Misc 2d 843, *affd* 13 AD2d 506). These factors are not the exclusive criteria to be considered and the relative importance of the factors will vary according to the particular facts. Thus, the fact that a decedent's will was based upon a mistaken idea as to the extent of his property did not mandate that the will be denied probate *(see, In re Jones' Will,* 85 NYS 294, 296; *see also, Matter of Santamorina,* 213 NYS 2d 555). Similarly, testamentary capacity was found and a will admitted to probate even where the decedent did not know the natural object of his bounty *(see, Matter of Arnold,* 200 Misc 909, *affd* 282 App Div 670).

Less mental acuity is required to execute a will than any other legal instrument *(Matter of Safer,* 19 AD2d 725, 726; *Matter of Coddington,* 281 App Div 143, 146, *affd* 307 NY 181). In our view, it is speculative to conclude that decedent did not know the nature and extent of his property merely because a bank managed his funds. The true nature of decedent's disability was not made clear at trial. It was generally agreed that he was a shy, retiring and nonassertive person who generally did what others suggested. Apparently, he was content to have the bank manage his pension funds and pay his bills. But it was also apparent that he knew the source of the funds and that he knew who to go to when he needed more than the spending money that he received each month.

The facts of the case at bar are in sharp contrast to *Matter*

*of Delmar* (243 NY 7), one of the few reported cases where evidence regarding a decedent's knowledge of the extent of his property was found important. In *Delmar,* an examination of the provisions of the will revealed that the decedent's inability to appreciate the extent of her property resulted in more than half of her vast estate not being provided for in the will. That case involved a death-bed will by a woman unable to recall the disposition of her property by a prior will and who believed that she was disposing of her entire estate by the provisions of her death-bed will. She believed this despite her attorney's adamant statements to her that she was not providing for a significant portion of her estate. Both her attorney and a doctor who witnessed the conversation testified to these facts at the trial. It is evident that upon the facts in the *Delmar* case, the decedent's failure to appreciate the extent of her property was highly relevant to the ultimate determination of testamentary capacity.

Here, decedent adequately expressed to the attorney who drafted his will a plan which disposed of his entire estate. The manner in which the will was drafted evidenced his capacity. The bequests were made to his nearest relatives and the percentages reflected the involvement each had had in his life. He gave more to Lorena and Roy, the two siblings who took an active part in his life, and left 3% of his estate to each of his remaining brothers and sisters. There were no specific bequests. The entire will was drafted in the same manner as a residuary clause, one of the purposes of which is to serve as a "catch-all" to dispose of unforeseen assets (39 NY Jur 2d, Decedents' Estates, § 991, at 548). Under these circumstances, the value of decedent's estate was of limited relevance to the issue of capacity. Nevertheless, the residuary nature of the dispositions was consistent with the liquid nature of decedent's assets. Similarly, the small percentages left to the siblings other than Lorena and Roy indicate that he was aware of the extent of his estate.

As stated above, we believe, upon the facts and circumstances of this case, that petitioners adequately established that decedent understood the nature and extent of his property. Respondents failed to submit any relevant evidence to the contrary and thus the issue should not have been submitted to the jury *(see, Matter of Kumstar,* 66 NY2d 691, *supra).* In *Matter of Kumstar (supra),* a case in which the Court of Appeals recited the traditional guidelines for determining testamentary capacity, the court went on to overrule a jury

verdict denying probate which had been unanimously affirmed by the Appellate Division. The Court of Appeals specifically found that there had been insufficient evidence to submit the case to a jury for a determination as to testamentary capacity. Yet, in that case, among other things, the decedent had been ill for a considerable period of time and she was rushed to the hospital shortly after executing her will. She died a few days later. Further, the will irrationally placed money in trust for her closest friends and relatives—all of whom were of advanced age—while there was no evidence of any meaningful relationship between her and the ultimate beneficiaries. Upon review of the record, we conclude no greater issue of fact was created in the instant case than was present in *Kumstar*. We would therefore reverse the decree, and grant the petition to admit the will to probate.

KANE, J. P., and MIKOLL, J., concur with LEVINE, J.; MAIN and HARVEY, JJ., dissent and vote to reverse in an opinion by HARVEY, J.

Decree affirmed, without costs.