*516 OPINION OF THE COURT
Kristin Booth Glen, S.
This case, with objectant’s contention that “mental competency and testamentary capacity are distinct concepts,” and his argument that an otherwise fully competent testator must also know the “extent or value of his estate,” presents an opportunity to revisit the law of testamentary capacity after a decade and a half of change in the way the law understands and evaluates competence and capacity.[1]
Facts and Procedural Posture
The testator, Abbas Khazaneh, was a wealthy Iranian businessperson who fled his homeland during the revolution of 1978, ultimately settling in this country with his wife Fatemeh Dorry Mehdi Khazaneh and four children, one of whom, Amir Ali Mehdi Khazaneh, is the proponent in this contested probate proceeding. Abbas had another child, Kaveh Khazaneh, born of an Iranian marriage — subsequently terminated by divorce — during a period in which Iran permitted polygamy.[2] Kaveh is the object-ant in this proceeding, challenging a will executed by Abbas in 1993 on the grounds of lack of testamentary capacity, fraud and undue influence.
Abbas died in October 2000 and the 1993 instrument was offered for probate in December 2001[3] together with “self-proving *517 affidavits” of the attorney-draftsperson, Harold Pappas,[4] and two attorney witnesses in his firm. Kaveh subsequently conducted SCPA 1404 examinations of all three, during which Pappas’s “will file” was also produced.
Transcripts of the examinations reveal that Pappas and Abbas had estate planning conversations for several weeks prior to execution of the will.[5] The proposed testamentary division was a common one — all to Fatemeh in trust, and then to their marital issue. Abbas told Pappas of Kaveh’s existence,[6] but made clear that he did not want Kaveh to inherit anything or to be mentioned in the will, even for the purpose of specifically disinheriting him. This resulted in conversations between Pap-pas and a senior estate planning partner, who advised that the will specifically name each of Abbas and Fatemeh’s marital children as remainder beneficiaries of the marital trust.
The examinations bolster the affidavits’ description of Abbas as a man fully in control of his faculties: alert, informed, and entirely clear about the testamentary disposition he had chosen to make. Based on all this evidence, as well as his own lengthy factual affidavit, Amir Ali moved for summary judgment.
Kaveh opposed the motion and cross-moved for further discovery.[7] In support of his position, and as evidence alleged to create triable issues of fact, Kaveh submitted affidavits and transcripts *518 from unrelated actions[8] which purport to show that: (a) the value of the companies in which Abbas held a majority interest[9] was far greater than the book value that Abbas reported to his attorney, Pappas; and (b) Abbas was a “mere figurehead” in the corporations, despite his title as chair, and was “kept in the dark” as to the workings (and, presumably, the value) of the businesses by Amir Ali.[10]
Although conceding that Abbas had “full mental competence” at the time of execution, Kaveh argues that the familiar test for testamentary capacity[11] creates a separate, independent requirement that a testator know the actual monetary value of her estate, a test allegedly not met here. This contention is belied by both the law and the facts, and calls into sharp focus the necessarily messy, contextual, indeterminate nature of our frequent efforts to determine the “competence” or “capacity” of a legal subject.[12] It is important to note, however, that the analysis of capacity which follows is undertaken in order to *519 locate the “nature and extent” prong of the Kumstar test within a contextualized inquiry, so as to reject the independent requirement of knowledge of value, for which Kaveh argues. It is not intended in any way to undercut the clear and overwhelming evidence of the decedent’s full competence and capacity.
Discussion
Throughout most of our legal history, judges and litigants have utilized unitary concepts like “competent” or “incompetent,” “sane” or “insane.” Notwithstanding this apparently simple framework, the genius of the common law presaged a more “functional” notion of capacity as legal standards or tests for capacity evolved differently in different areas of law.[13] It is only relatively recently, however, that the law has explicitly embraced the more nuanced view of modern psychology and psychiatry which recognizes that an individual may be perfectly “competent” in one area, and “incompetent” in another. Our Legislature adopted this functional approach to determining capacity when it enacted article 81 of the Mental Hygiene Law in the early 1990s.[14]
New York’s statutory standard for testamentary capacity, which requires only that the testator be of “sound mind and memory,” may seem to suggest a simplistic, decontextualized analysis. Yet the judicial interpretation of this standard in cases like Kumstar prescribes an analysis that looks to the testator’s task-specific functional capacity.
Specifically, if we were to start from scratch, asking what functions a testator needs to be capable of such that we have confidence in the instrument she signs, we would want to be assured that:
*520 • she was capable of knowing and appreciating that she was making a disposition of what she owned and/or controlled that would take effect upon her death,
• she was capable of understanding what she had, and what she was giving away, and
• she was capable of understanding to whom she was leaving her property, and why such a disposition might or might not comport with social norms and generally understood family values.[15]
Or, in short, we would come up with something very close to the classic formulation in Kumstar (supra).[16] And, unsatisfyingly uncertain and subjective as that may be, the law appropriately requires an individualized, contextualized investigation of the testator’s task-specific functionality at the time her will was executed. Within this framework, and under the circumstances of this case, proponent’s argument for a requirement of precise knowledge of the value of assets must fail.
First, a review of existing law rejects an independent requirement of knowledge of precise value. Cases decided on the second prong of the Kumstar test look to “a testator’s lack of awareness of or ability to keep in mind without prompting the general nature and extent of one’s real and personal property” (Matter of Fish, 134 AD2d 44, 46 [3d Dept 1987] [citation omitted; emphasis added];[17] see Matter of Santamorina, 213 NYS2d 555 [Sur Ct, Westchester County *521 1961]),[18] not whether the testator knew the precise values of all assets (Matter of Bush, 85 AD2d 887 [4th Dept 1981];[19] Matter of Crissy, NYLJ, Oct. 26, 2005, at 31, col 6 [Sur Ct, Suffolk County]; Turano and Radigan, New York Estate Administration § 3.04 [b], at 98-99 [2006 ed]). The cases relied upon by the objectant exemplify factual situations in which the testator’s failure of memory (Matter of Flynn, 71 AD2d 891 [2d Dept 1979]),[20] or quasi-delusional assessment of the property, coupled with other indicia of dementia (Matter of Slade 106 AD2d 914, 915 [4th Dept 1984]),[21] prove, or tend to prove, lack of task-specific functional capacity as a necessary aspect of testamentary capacity; they do not impose *522 an independent requirement involving precise knowledge of value or appropriate standards for determining valuation.[22]
There is, then, no “bright line” test for the quantum of knowledge necessary for a finding of capacity, but it is certainly the case that a testator need not obtain contemporaneous appraisals of the fair market value of all her property in order to make a valid will. Such a requirement is clearly unworkable, and entirely inconsistent with case law and general principles of the law of wills and estates.[23]
Moreover, the facts here underscore the requirement of contextualization in applying the Kumstar text. According to Amir Ali’s affidavit, Abbas staked his son Amir in a new diamond business using jewels of Fatemeh’s that he had managed to get out of Iran. When the first business failed, Amir started another gem dealership, RIMA, with the remains of the failed venture. The shares of that corporation were divided among the family members.[24] Although Abbas had the largest number of shares, and served as a figurehead when he came to the United States, Amir Ali states “it was never [Abbas’s] intention that he should be the actual owner of RIMA — [and] he began a pattern of gifting his shares of stock to the rest of us. He completed giv *523 ing away his entire interest in RIMA in 1998.”[25] The affidavit is corroborated by Pappas’s deposition testimony, which further describes Abbas’s intention, at the time he executed his will, to give away all his RIMA stock.[26] The timing of that gifting was clearly tax driven, as were the book values given by Abbas to his attorney for use in reporting the gift.[27]
Applying the test of task-specific functionality to these facts, it is clear that RIMA’s precise value, and Abbas’s “knowledge” of it, is of little or no consequence.[28] Thus, on these uncontroverted facts, the Kumstar test is purposively satisfied.
Moreover, it is not even clear that Abbas was unaware of RI-MA’s actual value. He gave his attorney a coherent, nondelusional account of the asset, and he had every reason to promote use of a conservative value in order to achieve his gifting plan in a reasonable period of time.[29] Although not necessary to defeat summary judgment here, the reasonable explanation for using book value further compels the conclusion that Abbas was fully functionally capacitated at the time he executed his will in 1993.
*524 Kaveh’s conclusory claims of fraud and undue influence[30] require little discussion. He does not — and cannot — point to any specific misstatements made by any of the legatees. Equally critical, Abbas’s clearly and emphatically stated reasons for disinheriting him dispel any possibility that Kaveh could meet the “but for” test inherent in both claims.[31]
It is well settled that “[s]ummary judgment, while unusual in a contested probate proceeding, is nonetheless proper where the proponent establishes a prima facie case for probate and the objectant fails to raise a material triable issue of fact” (Matter of Leach, 3 AD3d 763, 764 [3d Dept 2004] [citation omitted]). Objectant Kaveh has failed to present any facts that would require trial on his entirely speculative assertions, and his attempt to create a new, independent requirement that a testator know the precise or near precise value of her estate is similarly unpersuasive.
Accordingly, proponent’s summary judgment motion is granted, the objections to the December 21, 1993 will are dismissed and the motion by objectant to compel further discovery is denied.

. Such inquiry is timely in light of the current debate about “pre-mortem probate” (see, e.g. Gibbs and Carew, Pre-Death Probate — Does New York Allow It?, NYU, Oct. 20, 2004, at 3, col 1), although nothing in this opinion speaks to the propriety or desirability of adjudication of the validity of wills in the context of a Mental Hygiene Law article 81 proceeding. The focus on “functional capacity” for understanding and applying the traditional test for testamentary capacity suggests a conceptual commonality in the approaches employed by judges in probate and guardianship proceedings, without conflating the standards applicable in each. To the contrary, the functional approach recognizes the importance of tailoring legal capacity standards to the specific legal act(s) in question. (See e.g. Grisso, Evaluating Competencies: Forensic Assessments and Instruments, at 2 [2d ed 2003].)

. Although Abbas provided support over the years, there was no contact between the two families, and two of Abbas’s children with Fatemeh first learned of Kaveh’s existence when he filed objections in this proceeding.

. According to Amir Ali, the estate is without value, all assets having passed by extra-testamentary disposition. The decision to probate was made after Kaveh filed for letters of administration, claiming that Abbas left a large estate in which he expected to share.

. Pappas was a partner at Tenzer, Greenblatt (now Blank Rome LLP) who was introduced to Abbas by the latter’s long-time commercial attorney, Herbert Berman, a senior partner at Tenzer.

. Execution occurred at Tenzer, Greenblatt’s offices; no members of Abbas’s family, including Amir Ali, were present, nor had Pappas met with or spoken to any of them prior to execution.

. Pappas’s notes reflect the following:
“Reason for transferring [the shares in two corporations which are the crux of Kaveh’s claim] is to disinherit son by another woman. [Abbas] fought for three years in Iranian court and lost.
Birth certificate showing [Abbas] is father. Son shot in revolution. [Abbas] paid tuition in United Kingdom — returned to Tehran.
“No communication for 20 years until last year from Jakarta. Owes nothing to that son [under provisions] of Iranian law. Mother of son is not wife. He does not want to mention putative son in will [because his existence was unknown to some family members]. Perhaps side letter.”

. Kaveh’s document requests focus entirely on the value and extent of Abbas’s ownership of two related companies and other assets owned by decedent, both at the time of execution and during the three-year window period on either side. He also seeks to depose Amir Ah concerning the same issues.

. Amir Ali was a witness in criminal and civil cases against a Florida jeweler in which he testified to transactions and inventories substantially in excess of the book value of the corporations. Notably this testimony related to events several years after the execution of the propounded instrument.

. There were two closely related companies, RIMA and Amanased, both in the diamond business. The parties frequently refer to them together as RIMA, as does this opinion. The precise interrelationship is unimportant, although it is useful to note that the book value ascribed to RIMA was $2.8 million and to Amanased was $450,000, indicating the lesser importance of the latter.

. In addition, Kaveh notes that Abbas had bypass surgery in 1986 and subsequently developed diabetes “that could cause him to faint.” These “facts,” which do not specifically implicate mental abilities (Matter of Burack, 201 AD2d 561 [2d Dept 1994]), taken in light of the overwhelming evidence adduced, including Abbas’s continued health over additional years, are of no legal consequence here (see Matter of Van Patten, 215 AD2d 947 [3d Dept 1995]).

. Namely, “(1) whether [the testator] understood the nature and consequences of executing a will; (2) whether she knew the nature and extent of the property she was disposing of; and (3) whether she knew those who would be considered the natural objects of her bounty and her relations with them” (Matter of Kumstar, 66 NY2d 691, 692 [1985], rearg denied 67 NY2d 647 [1986] [citations omitted]).

. This is not a new problem. In an intriguing history of testamentary capacity, one legal scholar notes the similar struggle of nineteenth century judges “[d]aily immersed in the ‘tangled, muddy, painful and perplexed’ world of everyday experience,” citing William James, Pragmatism: The Present Dilemma in Philosophy, Pragmatism and Other Writings, at 715 (Giles Gunn ed 2000), to question whether there existed an objective standpoint from which to adjudicate matters of mental soundness while “safeguarding the ideal of human autonomy — against. . . state interference.” (Blumenthal, The Devi *519 anee of the Will: Policing The Bounds of Testamentary Freedom in Nineteenth-Century America, 119 Harv L Rev 959, 1033-1034 [2006].)

. The law has recognized that capacity is task specific in the oft-repeated observation that testamentary capacity is something less than contractual capacity. (E.g. Matter of Seagrist, 1 App Div 615, 620 [1st Dept 1896], affd without op 153 NY 682 [1897] [“The same clearness of comprehension and ability of expression which is required to enable a man to enter into a contract need not exist to enable him to make a valid will”].)

. Article 81 is illustrative, beginning with a presumption that every adult is fully capacitated. Only on a showing, by clear and convincing evidence, that a person lacks functional capacity to act and to understand the consequences of acting — or not acting — in a particular domain may the state intervene by appointing a guardian with powers limited and “tailored” to compensate for that proven incapacity. (Bailly, Practice Commentaries, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.01.)

. Family protection has been recognized as a value which the law recognizes in determining testamentary capacity. (See, e.g. Champine, Expertise and Instinct in the Assessment of Testamentary Capacity, 51 Vill L Rev 25, 33 [2006] [noting, inter alia, that although “(t)he testamentary capacity standard’s focus on the testator’s cognitive abilities suggests that medical, psychological and other evidence bearing directly on the testator’s thought processes ought to carry significant weight. . . the ‘moral aspect’ of the will, specifically its fairness to family, carries more weight than evidence of cognition per se”]; and see Blumenthal, supra.)

. Although the test stated by the court (and restated by innumerable lower courts over subsequent years) employed the literal term “know,” in actually applying the test, the court used the more cognitive term “capable of understanding” (Kumstar, supra at 692).

. Testator, who had suffered “shell shock” during World War II, had not handled his financial affairs for 36 years, a committee having been judicially appointed for him in 1944. The majority found, on the facts, that the jury did not err in finding that proponents had failed to meet their burden.
While disagreeing with the result, the dissent correctly states the law:
*521 “While a court must look to [the three prongs of the Kumstar text] when considering capacity . . . they are ‘but rough guides’ and each case must be decided upon its particular facts and circumstances (2B Warren’s Heaton, Surrogates’ Courts § 186-c [1] [c], at 32-238 [6th ed]; see, Matter of Horton, 26 Misc 2d 843, affd 13 AD2d 506). These factors are not the exclusive criteria to be considered and the relative importance of the factors will vary according to the particular facts. Thus, the fact that a decedent’s will was based upon a mistaken idea as to the extent of his property did not mandate that the will , be denied probate (see, In re Jones’ Will, 85 NYS 294, 296; see also, Matter of Santamorina, 213 NYS 2d 555)” (id. at 48 [Harvey J., dissenting]).

. Testator’s will recited that she did not own any real property, having previously “sold” her real estate to her daughter. In reality, she had conveyed only a life estate, not the fee, which remained in her estate. The court wrote “a will is not to be held invalid simply because the testatrix misunderstood the effect of a prior conveyance and failed to distinguish between an absolute and a limited grant” (id. at 557).

. In Matter of Bush, the testator did not know the precise size of his estate but knew it consisted of bank accounts and Veterans’ Administration funds and had managed his financial affairs until a few weeks before his death.

. In Matter of Flynn, there were a number of facts that raised a triable issue about testator’s capacity, insofar as he devised jewelry that he no longer owned, made a bequest to a nonexistent granddaughter, and left amounts of money to two sons in a significantly different proportion than he had indicated to this attorney.

. In Matter of Slade, there was extensive evidence of testatrix’s functional incapacity to handle her finances as, according to her broker, she had been unable to transact any business for the prior three years. Evidence included the fact that “her house was littered with more than $30,000 in cash and that she had not paid her income tax, property tax or utility bills” (id. at 915 [citation omitted]), as well as her delusion that her total assets amounted to only $10,000 when in fact her estate was valued at more than $650,000.

. The focus is necessarily on cognitive capacity (see e.g. Champine, supra), rather than objective knowledge. This is why article 81 uses the terms “understanding and appreciation” rather than “knowing” (Mental Hygiene Law § 81.02 [c] [2]). This is true not only as a matter of law, but, as well, because there is virtually no empirical evidence, nor are there psychological models of testamentary capacity and related concepts that mental health professionals have constructed, from which the law might draw. (Marson, Huthwaite and Hebert, Testamentary Capacity and Undue Influence in the Elderly: A Jurisprudent Therapy Perspective, 28 Law and Psychol Rev 71, 87 [2004].)

. In virtually all the decided cases, what the testator knows, or doesn’t know, or misunderstands as to value is evaluated in light of that particular testator’s circumstances, and all the other evidence surrounding the inquiry as to testamentary capacity. This understanding is consistent with the more general, less specific “nature and extent” language used in Kumstar and other testamentary capacity cases employing the three-pronged analysis (see e.g. Fish, supra at 45, and for an equally nonspecific description of the second prong, see e.g. Flynn, supra at 892 [“scope and extent”]). Moreover, a requirement of specific knowledge runs counter to the general principle favoring testamentary disposition over intestacy, and entirely undercuts the notion that testamentary capacity has less requirements than other functional capacities such as that required to make a valid contract (e.g. Matter of Seagrist, supra).

. Amir Ali’s affidavit states that “since [RIMA] was essentially started with the last of [Fatemeh’s] jewelry, [Abbas] thought we should all have a share. The stock was divided 35% to Abbas, 11% each to Fatemeh and three of her children, and 22% to Amir, who actually ran the business.”

. It is important to note that, in this probate contest, Kaveh is not challenging, nor could he, gifts made by the decedent substantially prior to his death.

. In addition to his deposition testimony, Pappas’s contemporaneous notes and time sheets show several discussions about gifting during the month or so preceding execution of the will, as well as conversations about the need for preparation of stock certificates and proxies. Pappas was subsequently involved in gifting the shares of RIMA, through and including 1998.

. Pappas’s deposition testimony and contemporaneous notes made clear that a great deal of thought went into the tax consequences of the estate plan, including considerations of Fatemeh’s shares of RIMA, whether to create a unified credit trust, the possible tax consequences of Fatemeh predeceasing Abbas, etc. The amount of the estate was important because Abbas was not yet a citizen. As Pappas testified, “based on the assets in Mr. Khazaneh’s name of about $800,000 and funeral and prayer services for Mrs. Khazaneh of about $100,000 and unified credit, there is not a problem with a $100,000 taxable estate for a few months.” Had RIMA been given a substantially higher valuation, both estate and gifting plans would have been substantially impacted.

. Of course, if one were under the delusion that an asset had no value, and relinquished the property for that reason, a different result might ensue. There is no such “but for” allegation made anywhere in this case.

. While gifts to Fatemeh were not taxable, Abbas was limited to $10,000 per year for gifts to each of the four children he had with her. This, perhaps, is why Pappas testified that he did not question the book value of the corporations, or make further inquiry as to the fair market value beyond Abbas’s representation.

. Matter of Dietrich, 271 AD2d 894, 394 (3d Dept 2000) (“Conclusory allegations and speculation are insufficient to raise a question of fact” on issues of fraud and undue influence).

. “But for” is clearly a requirement for fraud. (E.g. Matter of Bianco, 195 AD2d 457 [2d Dept 1993]; Matter of Mottola, NYU, Jan. 29, 1999, at 33, col 5 [Sur Ct, Westchester County].) As to undue influence, which
“can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person” (Matter of Collins, 124 AD2d 48, 54 [4th Dept 1987], citing Matter of Anna, 248 NY 421, 424 [1928]), the uncontroverted facts rebut any possibility of successfully pressing this claim, upon which objectant bears the burden.