Matter of Falkowsky (2021 NY Slip Op 05122)





Matter of Falkowsky


2021 NY Slip Op 05122


Decided on September 29, 2021


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 29, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
MARK C. DILLON
ANGELA G. IANNACCI
LINDA CHRISTOPHER, JJ.


2020-08400

[*1]In the Matter of Harold Falkowsky, deceased. Alice Sobel, petitioner-appellant; Jeffrey Falkowsky, objectant-respondent. (File No. 776/2015)


Piscionere & Nemarow, P.C., Rye, NY (Anthony G. Piscionere and Michael Konicoff of counsel), for appellant.
Greenfield Stein & Senior, LLP, New York, NY (Harvey E. Corn, Charles T. Scott, and Gina M. Ciorciari of counsel), for respondent.



DECISION & ORDER
In a contested probate proceeding, the petitioner appeals from a decree of the Surrogate's Court, Westchester County (Brandon R. Sall, S.), dated October 7, 2020. The decree, upon a decision of the same court dated August 27, 2020, made after a nonjury trial, in effect, granted the objections alleging lack of testamentary capacity and undue influence, and denied the admission of the will to probate.
ORDERED that the decree is affirmed, with costs payable personally by the appellant.
Factual and Procedural Background
The decedent, Harold Falkowsky, a retired accountant, died on January 14, 2015, at the age of 83, at White Plains Hospital Center (hereinafter WPH), where he had been hospitalized since December 1, 2014. On December 15, 2014, the decedent purportedly executed a last will and testament (hereinafter the will) in which he bequeathed $20,000 to each of his sons, Ira Falkowsky and the objectant, Jeffrey Falkowsky, 50% of the residuary estate to charities, and the remaining 50% of the residuary estate to his sister, the petitioner, Alice Sobel.
In March 2015, Alice filed a petition for probate of the will and letters testamentary. Jeffrey filed objections to probate of the will, alleging, inter alia, that the decedent was not mentally competent when the will was executed and that the will had been procured by undue influence.
At a nonjury trial, the following evidence was adduced. The decedent's wife, Charlotte Falkowsky, predeceased him in July 2006, and the decedent is survived by their two sons and by his sister, Alice. Ira resided in New Jersey with his wife and two sons, one of whom has special needs. At the time of his death, the decedent had been supporting Ira for years. Jeffrey, who is married and has two daughters, was domiciled in New Mexico since 2006, but resided in Ireland from January 2014 through September 2015 on a work assignment.
The decedent resided in a cooperative apartment in Brooklyn until he suffered a fall [*2]on August 31, 2014, and was admitted to Coney Island Hospital (hereinafter CIH). On September 4, 2014, he was transferred to Haym Salomon Home for Nursing and Rehabilitation (hereinafter Haym Salomon) for rehabilitation. The nursing admission notes indicate that the decedent was totally dependent upon the staff for many activities of daily living. When Haym Salomon indicated that it needed to discharge the decedent, Alice applied for him to be admitted to the Esplanade Senior Residence (hereinafter Esplanade) in White Plains because it was close to her home in Mount Kisco. The approximate value of the decedent's total assets listed on the application as reported by him to Alice is in the amount of $200,000. Alice signed parts of the residence application and lease agreement as "POA" on October 14, 2014, prior to the decedent's signing of a power of attorney designating her as his attorney-in-fact.
As the Esplanade required a power of attorney and health care proxy before granting admission, Alice contacted her attorney, Allison Guthrie Fischer. On October 21, 2014, Fischer met with Alice and the decedent at the Esplanade, and the decedent executed a power of attorney naming Alice his attorney-in-fact and also executed a health care proxy naming Alice as his agent. Alice asked Fischer to ask the decedent to prepare a will. Fischer testified that when she began to ask the decedent questions about his assets, Alice interrupted and talked over him, and Fischer sensed that the decedent was uncomfortable talking in front of Alice. The decedent mentioned that he had a couple of certificates of deposit (hereinafter CDs) or bank accounts, with a value of approximately $100,000; he identified Merrill Lynch and Ramirez accounts by name. He told Fischer that most of his assets were "in cash." He did not know how much his cooperative apartment was worth. He was not sure what he wanted to do with his assets. By letter dated November 11, 2014, Fischer requested that the decedent call her office to arrange an appointment to "consider" his will. The decedent never called to arrange for such an appointment.
On December 1, 2014, the decedent was taken by ambulance to WPH and admitted, at which time he appeared "chronically ill." The decedent's past medical history included, among other things, stage IV prostate cancer with bone metastasis. On December 4, 2014, the decedent choked on his breakfast and "went into respiratory and cardiac arrest requiring cardiopulmonary resuscitation and intubation and transfer to the Intensive Care Unit [hereinafter ICU]." On December 4, 2014, Alice signed a consent for surgery and/or other procedures on behalf of the decedent.
Fischer testified that on December 4 and 5, 2014, Alice called Fischer, advising her that the decedent was in the hospital. On December 6, 2014, a Saturday, Fischer was spending time with her family when Alice made 8 to 10 "frantic" phone calls to her. Fischer testified that Alice wanted Fischer to pick up Alice and take her to WPH to see her brother; Alice maintained that the decedent needed a will, and it was "imperative" for him to do a will. Fischer testified that they drove to the hospital through wind and rain, in an "incredible storm." Contrary to Fischer's testimony, Alice testified that she did not tell Fischer that the decedent needed a will, but rather that she told Fischer the decedent needed "more advice than [Alice could] give him." Alice testified that she did not know the reason Fischer came with her to the hospital. The medical records indicate that on that date, the decedent was in the ICU and was critically ill. He was on a ventilator part of the day and thereafter had a venti mask. First, Alice spoke with him for a while alone, and then Fischer went in the decedent's hospital room and asked Alice to leave. According to Fischer, with regard to his assets, the decedent mentioned that he had a cooperative apartment, but he did not know the fair market value. He claimed to have approximately $1 million in stocks and investments, as well as approximately $200,000 in other bank accounts, but he could not remember the names of the banks. He had an IRA, but did not know the beneficiary. Fischer testified that the decedent understood his assets to be in the $1.5 million range. Fischer testified that because the decdent was a CPA, he knew that this was not a taxable estate. After further discussion, during which Fischer discouraged him from leaving the entire residuary estate to Alice, the decedent decided he wanted to leave a portion of his estate, totaling $82,000, to five different named charities, with the balance of the residuary estate to go to Alice.
When discussing his assets with Fischer, the decedent did not provide any information regarding a tax deferred annuity in the amount of $884,447 that he was entitled to inherit from his [*3]wife, who died on July 19, 2006, but which he had never collected. While the decedent had filed a confirmation of his wife's death, dated August 2006, with the retirement system, and was sent a letter dated September 5, 2006, advising him of the value of the annuity and how to collect it, he did not apply to collect the annuity until December 2010, at which time he designated his sons as beneficiaries. By correspondence dated May 6, 2011, the decedent was notified that his application had been rejected due to the payment method he had chosen and new forms were enclosed, along with a contact number for assistance. Thereafter, the decedent sent a letter dated September 27, 2012, to the retirement system, asking how to claim the benefit. In correspondence dated October 17, 2012, the retirement system sent the decedent a form and instructions regarding how to collect the benefit, as well as a contact number for assistance. However, there was no further communication from the decedent. During the time period that the decedent did not collect the annuity, no interest accrued.
The decedent also did not provide Fischer with any information regarding, among other things, two bank accounts, one at HSBC and one at Capital One Bank, with a total balance of approximately $167,700 that were held in trust for his sons. Alice testified that she did not know the kind of assets the decedent owned prior to his death. However, on December 16, 2014, one day after the decedent signed the will, Alice withdrew the funds and closed these two accounts. Alice also wrote checks dated December 5 and 6, 2014, payable to herself, in the amounts of $10,000 and $5,000, respectively, that were drawn on the decedent's account and signed by her as "agent." Also on December 6, 2014, Alice wrote a check payable to Susan G. Komen in the amount of $100 that was drawn on the decedent's account and signed by her as "agent." There was no evidence that the decedent had directed Alice to do so, or that he had ever donated to this charity.
Jeffrey testified that Alice did not tell him that the decedent was in the hospital until December 8, at which time he brought his family back from Ireland to New Mexico, as his wife's health was very bad at that time, and then he came to New York.
Despite the facts that Alice, not the decedent, reached out to Fischer to draft a will for the decedent, and that the decedent never called Fischer, on December 8, 2014, Fischer came to the hospital with a draft of the will reflecting her discussions with the decedent on December 6. The decedent was still in the ICU. On that day, it was noted in the medical records that, inter alia, the decedent was critically ill, his speech was slurred, and he suffered from right lateral gaze palsy. Fischer testified that she told the decedent that the will as drafted "just doesn't work." Fischer testified that to avoid a will contest, she encouraged the decedent to leave $100,000 or $200,000 to each son. He agreed to leave $20,000 to each son.
On December 13, 2014, the hospital records show that the decedent developed respiratory arrest with thick secretions in his upper airway at the time of intubation. The decedent was put on a ventilator. He was transferred to the critical care unit (hereinafter CCU), was sedated with morphine, and was treated with antibiotics for sepsis and septic shock. That same day, according to the hospital records, Alice advised the doctors that they had permission to speak with the decedent's sons, but that the sons should not be permitted to make any decisions regarding his care; she wanted her "baby brother" to be kept alive. On December 14, 2014, hospital records note that the decedent exhibited an inability to follow instructions, disorientation, confusion, inability to benefit from education, impulsive behavior, and a potential to injure himself. He exhibited worsening renal function. He was intubated, on a ventilator, unable to speak, and sedated with lorazepam.
The decedent executed the will on December 15, 2014. Fischer, accompanied by her partner and her paralegal, who were to be witnesses to the will signing, arrived at the hospital at approximately 11:25 a.m. for the decedent to sign the will. Fischer testifed that she advised the witnesses to "remember this day because this is going to be a contested will." The hospital records reflect that on December 15, 2014, the decedent was intubated and on a ventilator; he was unable to speak. At 8:05 a.m., a few hours before he executed the will, the decedent exhibited an inability to follow instructions, disorientation, confusion, inability to benefit from education, impulsive [*4]behavior, and a potential to injure himself, although the records from 11:42 a.m. and 4:05 p.m. indicate that he was awake and alert. He was noted to have right lateral gaze palsy and partial left lateral gaze palsy, and it was suggested that the decedent may have had a stroke. Fischer testified that when she was alone in the room with the decedent, a nurse advised her that the decedent could not sign anything, but Fisher requested that she leave the room and the decedent waved the nurse out of the room. After the decedent signed the will, Fischer sent a signed copy to the decedent at Alice's address.
In January 2015, after discussion with the doctor, Alice chose inpatient hospice care for the decedent. Alice testified at trial that she and the decedent never had any conversations regarding what he did or did not want her to do as his health care agent or what his wishes were if he were to be on life support. Jeffrey testified at his deposition that Alice spoke with him regarding health care decisions she was making for his father only once, some time between December 19, 2014, and early January 2015, at which time he told her that he believed his father would not want a do not resuscitate order signed. On January 14, 2015, the decedent died at WPH. The causes of death were, inter alia, aspiration pneumonia; septic shock; possible brain stem cerebrovascular accident; respiratory failure; congestive heart failure, acute diastolic dysfunction; acute kidney failure; and prostate cancer with bony metastatic lesions.
Alice testified that she continued to pay the bills to a certain Jewish Community Center after the decedent's death to enable the decedent's grandsons, Ira's sons, to continue to have a Jewish education and a Bar Mitzvah. She knew those were the decedent's wishes and she paid for everything she could because she knew that was what he wanted.
After the trial, in a decision dated August 27, 2020, the Surrogate's Court determined, inter alia, that (1) Alice failed to establish that the decedent had the requisite testamentary capacity to execute the will and (2) the will was the product of undue influence by Alice. On October 7, 2020, a decree was entered, in effect, granting the objections alleging lack of testamentary capacity and undue influence, denying admission of the will to probate, and directing that the preliminary letters testamentary issued to Alice be revoked. Alice appeals.
Discussion
"In reviewing a determination made after a nonjury trial, this Court's authority is as broad as that of the trial court, and this Court may render the judgment it finds warranted by the facts, taking into account in a close case that the trial judge had the advantage of seeing and hearing the witnesses" (Matter of Marsh, 106 AD3d 1009, 1011; see Matter of Duplessis, 123 AD3d 927, 927). "The credibility determinations of the Surrogate, who presided at the trial and heard all of the testimony, are entitled to great weight on appeal" (Matter of Coviello, 57 AD3d 662, 663; see Matter of Neary, 44 AD3d 949, 950). Here, the Surrogate's Court found that "Jeffrey testified, credibly, that he spoke with and visited [the decedent] on various occasions, despite the fact that he lived a considerable distance away." In contrast, the court found that Alice's testimony was "at times very questionable, at other times false or completely inaccurate, rendering [the] court to question Alice's general veracity."
Testamentary Capacity
"It is the indisputable rule in a will contest that '[t]he proponent has the burden of proving that the testator possessed testamentary capacity and the court must look to the following factors: (1) whether she [or he] understood the nature and consequences of executing a will; (2) whether she [or he] knew the nature and extent of the property she [or he] was disposing of; and (3) whether she [or he] knew those who would be considered the natural objects of her [or his] bounty and her [or his] relations with them'" (Matter of Kumstar, 66 NY2d 691, 692, quoting Matter of Slade, 106 AD2d 914, 915; see Matter of Gobes, 189 AD3d 1402, 1404; Matter of Martinico, 177 AD3d 882, 884).
Understanding Nature and Extent of Property
Here, the record shows that, contrary to Alice's contention and the position of our dissenting colleague, Alice failed to demonstrate that the decedent knew the nature and extent of the property of which he was disposing (see Matter of Fish, 134 AD2d 44, 46; Matter of Slade, 106 AD2d at 915). "While a testator need not have precise knowledge of the size of his [or her] estate, the authorities clearly hold that a testator's lack of awareness of or ability to keep in mind without prompting the general nature and extent of one's real and personal property requires denial of probate" (Matter of Fish, 134 AD2d at 46 [citation omitted]). The decedent, who lived carefully on social security and pension income alone without invading his assets, failed to recall that he was entitled to receive his late wife's annuity, valued at $884,447.32, which was the single largest asset of his estate. Significantly, although he was an accountant, he was unable to collect the annuity. That the decedent was able to tell the attorney who prepared the will that his estate was not taxable, and that he had not taken the minimum distribution for 2014 for his individual retirement account (hereinafter IRA), yet never mentioned the annuity, is evidence of his inability to recall this very significant asset. Contrary to our dissenting colleague's opinion, the record does not support the view that the decedent had deemed his right to the annuity as waived or lost, but rather the record demonstrates that the decedent was unable to manage the process of collecting the annuity and no longer recalled that it existed.
Moreover, Alice testified that the decedent told her his total assets amounted to $200,000. The decedent then told the attorney who prepared the will that his total assets amounted to $1.5 million, when in fact, with the annuity, his assets, including nonprobate property consisting of an IRA in the amount of $258,299, are valued at more than $2.6 million. This amount does not include the CDs the decedent claimed were held in trust for his grandchildren, which are not listed on the inventory of assets filed with the Surrogate's Court.
Additionally, other than two accounts, the decedent was unable to specifically identify by name any of his accounts; moreover, he did not know the value of the accounts. He never communicated to the attorney drafting his will that he had two accounts in trust for his sons, with a total value of approximately $167,700. With regard to the CDs the decedent claimed were held in trust for his grandchildren, he did not remember where they were located, nor did he impart their values. Notably, while the attorney drafter was experienced and was expecting that probate would be contested, she did not ascertain most of the details regarding the nature and extent of the decedent's property.
On the day he executed the will, the 83-year-old decedent, who had stage IV prostate cancer, had been a patient at WPH for two weeks, since December 1, 2014. He was admitted with a fever, generalized weakness, pneumonia, bilateral pleural effusion, and a 30-to-40-pound weight loss over the prior three to four months. During those two weeks, he had a choking incident on December 4, which caused respiratory and cardiac arrest and resulted in intubation and transfer to the ICU, and a second incident on December 13, two days prior to executing the will, during which he developed respiratory arrest, was transferred to the CCU, and was sedated with morphine. At times, during the day before he executed the will, as well as on the morning of the day of the execution, the decedent exhibited an inability to follow instructions, disorientation, confusion, inability to benefit from education, impulsive behavior, and a potential to injure himself. On both the day prior to the execution of the will and the day the will was executed, the decedent was intubated and on a ventilator and unable to speak. The decedent was also sedated with lorazepam the day before the execution of the will.
While it has been established that "[m]ere proof that the decedent suffered from old age, physical infirmity and chronic, progressive senile dementia when the will was executed is not necessarily inconsistent with testamentary capacity and does not alone preclude a finding thereof" (Matter of Buchanan, 245 AD2d 642, 644; see Matter of Hedges, 100 AD2d 586), the facts of this case are distinguished from Buchanan, wherein two physicians testified that the testator had testamentary capacity at the time she signed the will. In this case, despite the decedent having been hospitalized at the time he executed the will, no physicians testified as to his capacity. Moreover, the decedent in Buchanan was diagnosed with dementia four months after the execution of the will. [*5]The decedent herein exhibited inability to follow instructions, disorientation, confusion, inability to benefit from education, impulsive behavior, and a potential to injure himself less than four hours before the execution of the purported will.
Accordingly, the Surrogate's Court properly determined that Alice failed to prove that the decedent possessed the requisite testamentary capacity, as she failed to establish that the decedent knew the nature and extent of the property of which he was disposing (see Matter of Fish, 134 AD2d at 47).
In light of our determination, we need not reach Alice's remaining contentions.
LASALLE, P.J., IANNACCI and CHRISTOPHER, JJ., concur.
DILLON, J., dissents, and votes to reverse the decree, deny the objections alleging lack of testamentary capacity and undue influence, and admit the decedent's will to probate, with the following memorandum:
This proceeding raises issues of (1) whether the decedent had testamentary capacity, and (2) whether the will was procured by undue influence. The Surrogate's Court, after a nonjury trial, sustained the objections to probate on both grounds, and denied the admission of the will to probate.
The decedent, Harold Falkowsky, died on January 14, 2015. The will offered for probate was executed on December 15, 2014, and named the petitioner, Alice Sobel, the decedent's older sister, as executor. The will was executed under the supervision of an attorney, Allison Guthrie Fischer, in the presence of two witnesses who signed self-proving affidavits. The supervision of counsel triggers a presumption that the execution of the will comported with statutory provisions (see Matter of Moskoff, 41 AD3d 481, 482; Matter of Tuccio, 38 AD3d 791; Matter of Levenson, 289 AD2d 577, 578). Indeed, there is no reading of this record other than to conclude that Fischer, an attorney who specializes in the area of trusts and estates, with extensive experience in will-drafting, handled this matter with a high degree of caring, conscientiousness, and capability each time she interacted with the decedent. Such interactions include, but are not limited to, the draftsmanship of
the will, her advices to the decedent, her attention to detail, and the execution of the document itself.
Also clear from the record is that during all meetings between Fischer and the decedent on October 21, 2014, at the Esplanade Senior Residence (hereinafter Esplanade), and on December 6, 2014, December 8, 2014, and December 15, 2014, at White Plains Hospital Center (hereinafter WPH), the decedent was firm, consistent, and unwavering in expressing that he wished to leave no portion of his estate to his two sons, Ira Falkowsky and Jeffrey Falkowsky, the objectant (see Matter of Walker, 80 AD3d 865). The decedent gave reasons for wanting to exclude his sons from any meaningful portion of the estate, stating on one occasion to Fischer that the sons "do nothing for him" and on a different occasion to Fischer that they "don't give a s**t, and he's asked for help" from them. The decedent complained that his sons did not visit him, whereas his sister, Alice, regularly visited him at the Esplanade and at WPH. The decedent's expressions of disdain for his sons is repeated at various times throughout the notes in Fischer's file, and even in notes contained in his hospital chart. When Fischer advised the decedent that the will should contain some bequest to both sons, with an in terrorem clause, as it would be strategically wise to deter a challenge to probate, the decedent initially, and reluctantly, agreed to provide each son with only a $2,000 bequest. Fischer later persuaded the decedent to bequeath $20,000 to each son with an in terrorem clause, which was well below the $100,000 to $200,000 bequest to each that Fischer had recommended. When Fischer recommended a higher bequest to the sons, the decedent's response was "to hell with them." The will ultimately provided that after $20,000 payments to each of the sons, the remainder of the decedent's estate was to be divided 50% to various defined charities and 50% to Alice. Thus, in addition to the presumption of due execution under the supervision of counsel, the terms of the will reflected the decedent's oft-repeated, clear, unyielding, and consistent desire to exclude his sons from the overwhelming bulk of his estate.
On December 15, 2014, the date the decedent executed the will, he was a patient at WPH. He had been admitted to WPH on December 1, 2014, and intubated days later. However, according to Fischer, the decedent was alert, sitting up in bed, and able to communicate with nods of the head, hand gestures, and notes. According to Fischer, she reviewed the will with the decedent in detail over the course of 20 to 25 minutes. He nodded or grunted his assent to all of the various provisions of the will, including his desire for the in terrorem clause and the appointment of Alice as the executor. He scowled at the point involving the $20,000 bequest to each of his sons. Then, in the presence of the two witnesses, the dispositive provisions of the will were reviewed again, and the decedent nodded his agreement at all relevant times. Fischer testified that she "absolutely" believed that the decedent was competent to make a will, was not under any duress in doing so, and explained that she would not have supervised the execution of the will if she had any reason to believe that he was not competent. The two witnesses to the execution of the will confirmed Fischer's account of what had occurred in their presence, and both testified that the decedent was competent at the time the will was executed.
Shortly after Fischer's arrival at the decedent's hospital room to finalize the will, a nurse appeared and said that the decedent could not sign anything, and asked Fischer to leave the room. Upon hearing this, the decedent waved the nurse out of the room, and belied the nurse's concerns by sitting up in the bed, reviewing the provisions of the will, and ultimately signing the document. "Mere proof that the decedent suffered from old age, physical infirmity and chronic, progressive senile dementia when the will was executed is not necessarily inconsistent with testamentary capacity and does not alone preclude a finding thereof, as the appropriate inquiry is whether the decedent was lucid and rational at the time the will was made" (Matter of Buchanan, 245 AD2d 642, 644 [citations omitted]; see Matter of Hedges, 100 AD2d 586, 588). A hospital note from December 5, 2014, indicated that the decedent had appointed Alice as his health care proxy, signed the form in the presence of a physician, and made clear that he did not want his sons involved or updated as to his status. Another hospital note, from December 8, 2014, reflected the decedent's understanding of the medications and procedures that were explained to him. Elsewhere, notes in hospital charts frequently described the decedent as being alert and oriented. At the time of intubation, the decedent was disoriented, confused, and impulsive, but nonetheless oriented as to person, cooperative, calm, and followed commands. Significantly, on the date the decedent executed his will, the hospital chart noted that he was able to follow commands, was involved in discussions of medications and side effects, and was awake, responsive, and alert. No evidence admitted at trial, including medical documentation, established that the decedent was not possessed of testamentary capacity at the time the will was executed. Accordingly, Alice proved by a preponderance of the evidence that the decedent understood the nature and consequences of making a will, and Jeffrey's evidence to the contrary was insufficient in response (see Matter of McCloskey, 307 AD2d 737, 738).
Contrary to the Surrogate's Court's determination and the opinion of the majority on appeal, the decedent knew the nature and extent of the property of which he was disposing. Initially, the decedent had estimated for Fischer the value of his estate to be approximately $1.5 million, consisting of $1 million in various stocks and investments, a small cooperative apartment in Brooklyn, and additional sums in various bank accounts with roughly $100,000 in each. While the value of the co-op was listed on the application to the Esplanade as approximately $500,000, the record is unclear whether the decedent, in speaking with Fischer, included the co-op in estimating the value of his estate. The decedent's description of the general nature and value of his assets was essentially accurate. Nonetheless, the court found that the decedent did not know the nature, extent, and distribution of his property upon concluding that the value of the estate, based upon exhibits received into evidence, was more than $2.9 million. However, the court's calculation was in error. The estate's list of gross assets identified what was individually owned or receivable to be $1,466,337.09, which was consistent with the amount the decedent had estimated as the value of his estate in his discussions with Fischer.
Separately, the decedent's wife, who predeceased him, had an annuity worth $888,447. In 2010, the decedent made attempts to collect the annuity, but his claim was rejected as untimely at that time, and again in 2012, apparently without further follow-up. There is no evidence [*6]in the record that, given the passage of time since 2012, the decedent had deemed his right to the annuity as anything other than waived or lost. Significantly, he did not mention this annuity as among the assets he described to Fischer as part of his estate. Even adding to the decedent's assets $258,299 of nonprobate property held in a Deutsche Bank account in trust for the two sons, the decedent's description of his assets and their values, while general in some respects, was sufficiently accurate and need not be specific (see Matter of Fish, 134 AD2d 44, 46). Alice therefore met her burden of establishing that the decedent knew the general nature and extent of his real and personal property, Jeffrey failed to establish adequate evidence to the contrary, and the Surrogate's Court should not have denied probate on the basis of this issue (see Matter of Walker, 80 AD3d at 867).
The final issue relevant to this appeal is that of undue influence. Typically, the objectant bears the burden of establishing that a will is a product of undue influence (see Matter of Nurse, 160 AD3d 745, 748; Matter of Albert, 137 AD3d 1266, 1268). The burden shifts to the beneficiary to show the absence of undue influence in the event that there is a confidential relationship (see Matter of Nurse, 160 AD3d at 748). Here, a confidential relationship did not exist between the decedent and Alice merely by virtue of their familial relationship as brother and sister (see Matter of Bonzcyk v Williams, 119 AD3d 1224, 1226), or from Alice's mere power of attorney (see Matter of Giaquinto, 164 AD3d 1527, 1530, affd 32 NY3d 1180; Dwyer v Valachovic, 137 AD3d 1369, 1371), or from Alice's role in paying some of the decedent's bills and collecting his mail (see Matter of Jacobs, 93 AD3d 917, 918). Nevertheless, assuming that the Surrogate's Court correctly found the existence of a confidential relationship based upon the totality of the interactions between brother and sister, the record is still insufficient to conclude that the will was a product of undue influence.
"'Although undue influence may be established through circumstantial evidence, such evidence must be of a substantial nature, and an inference of undue influence cannot be reasonably drawn from circumstances when they are not inconsistent with a contrary inference'" (Matter of Bullock, 172 AD3d 853, 855, quoting Matter of Ciani, 165 AD3d 655, 657). Here, Alice rendered assistance to her brother prior to his hospitalization. She stepped up to care for her brother during his time of need when his sons, Ira and Jeffrey, generally did not do so. While Alice certainly played a key role in helping the decedent obtain a will in his final weeks, which was aptly noted by the Surrogate's Court, the evidence does not demonstrate that she steered the content of the will in her favor. A person's involvement in the drafting of the terms of another person's will is the hallmark of undue influence (see Matter of Ramirez, 68 Misc 3d 1207[A], 2020 NY Slip Op 59879[U], *7 [Sur Ct, Queens County]; see generally Matter of Elmore, 42 AD2d 240, 241). The six categories of facts cited by the court in support of its finding of undue influence bear no actual relation to whether Alice endeavored to affect how the decedent's assets would be devised in the will. There is an absence of evidence that Alice spoke with the decedent about any specific bequests that benefitted herself or that she otherwise influenced the terms of the will itself. On the one occasion when Alice, Fischer, and the decedent spoke about terms of the will, which was at the Esplanade on October 21, 2014, the conversation focused on the possibility of leaving the entirety of the estate to the decedent's grandchildren, in trust accounts. "There must be some evidence, even if it is only circumstantial, that the confidential relationship was utilized to influence the testator's wishes or the will drafting process, before the inference of undue influence arises and the beneficiary is put to the test of explaining the bequest to a [trier of fact]" (Matter of Bartel, 161 Misc 2d 455, 458 [Sur Ct, NY County]). Here, it cannot be said that Alice exercised influence that amounted to moral coercion, destroyed the decedent's free agency, or constrained the decedent from following his free will and desire which he was unable to refuse or too weak to resist (see Matter of Hadden, 188 AD3d 686, 688; Matter of Martinico, 177 AD3d 882, 885; Matter of Marra, 123 AD3d 1130, 1131; Matter of Capuano, 93 AD3d 666, 668). Indeed, the decedent, in his multiple conversations with counsel, and as noted in his hospital chart, of all places, was so consistently strong-willed in his desire to exclude his two sons from the bulk of the estate, that no one exercised undue influence upon his decision-making or judgment (see Matter of Mendelson, 116 AD3d 477, 478; Matter of Stafford, 111 AD3d 1216, 1218). Under these circumstances, the determination to deny probate of the will defeats the decedent's clear, consistent, and repeated expressions of his desire to exclude his sons from any meaningful inheritance, as reflected in his properly executed and witnessed last will and testament.
For the foregoing reasons, I vote to reverse the decree, deny the objections alleging lack of testamentary capacity and undue influence, and admit the will to probate.
ENTER:
Maria T. Fasulo
Acting Clerk of the Court