[631 NYS2d 298]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
DONALD LOWE, Appellant.

First Department, August 31, 1995

### APPEARANCES OF COUNSEL

*Elizabeth B. Emmons* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Lisa Ellen Mudd* of counsel *(Billie Manning* on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

While we are in agreement with the dissent that, in accordance with *People v Page* (72 NY2d 69), the trial court's premature discharge of a sitting juror warrants reversal and a new trial on the charge of criminal possession of a weapon in the third degree, we find, on our review of the record and on the authority of *People v Montanez* (41 NY2d 53), that the evidence in support of defendant's conviction of criminally negligent homicide was legally insufficient and dismiss that charge.

Defendant's conviction arises out of the shooting death of his close friend, Calvin Johnson, 18 years of age, on June 14, 1990, after an evening of drinking on the stoop in front of the apartment building at 2352 Walton Avenue, where Calvin lived. Other than defendant, there were no eyewitnesses to the event. According to defendant, who testified at trial, Calvin, who had a gun in his waistband, had been pulling the gun out

and fooling around with it as the evening wore on. At one point, Calvin went upstairs to his apartment, returning a short time later with the gun still in his waistband. Calvin began to pull the gun out again and defendant repeated earlier warnings he had given to Calvin to stop playing with it. When defendant reached over to take the gun away it discharged, mortally wounding Calvin.

Defendant then grabbed the gun and ran upstairs to Calvin's apartment. Calvin's sister and a boyfriend, William Owes, described defendant as frantic and panicky as he entered the apartment. Defendant repeatedly stated that he had mistakenly or accidentally shot Calvin. When told to get the gun out of the apartment, defendant threw it out a window. He ran downstairs and around the corner and called an ambulance. After returning to the stoop, he observed two police officers at the corner on motor patrol. Defendant ran over and summoned them to the scene. When questioned by the officers, defendant denied witnessing the shooting, a denial which he was to repeat twice more to detectives at the scene and later at the precinct.

The statutory definition of criminally negligent homicide involves an interplay of two provisions. Penal Law § 125.10 provides, "A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person." Penal Law § 15.05 (4) provides that "[a] person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." As the Court of Appeals has made clear, however, "the carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and that the carelessness must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong [citations omitted]." *(People v Boutin,* 75 NY2d 692, 695-696.) "[C]riminally negligent homicide requires not only a failure to perceive a risk of death, but also some serious blameworthiness in the conduct that caused it. The risk involved must have been 'substantial and unjustifiable', and the failure to perceive that risk must have been a 'gross deviation' from reasonable care." *(Supra,* at 696.)

*People v Montanez* (41 NY2d 53, *supra)* involved a prosecution for the shooting death by the defendant of an old friend. The two were alone for an hour and one half in the kitchen of the deceased's home, conversing, according to prosecution witnesses, about a drug debt, when others, who were having drinks in the living room, heard a loud popping sound emanating from the kitchen. There was testimony that the deceased, bloodied, staggered into the living room, asking, " '[w]hat did you shoot me with?' ", to which the defendant responded, " 'I was just showing it to him' " or " 'I'm sorry. I just wanted to show it to him.' " *(Supra,* at 55.) The defendant dropped to his knees and began crying and hugging the deceased. A witness testified that he saw in defendant's hand a small revolver, which he placed in his pocket before leaving the house. The gun was never recovered. The defendant testified that, after a friendly conversation unrelated to drugs, as he turned to put on his jacket to leave, the deceased told the defendant that he had " 'a nice piece to show you' ". *(Supra,* at 56.) The defendant turned, saw the gun, which, as he took it, went off. The defendant conceded that at the time the shot was fired the gun might have been in his hand and that he probably carried it into the living room where he placed it beside the body. He denied bringing the gun to the house and insisted that it belonged to the deceased.

The Court of Appeals found the evidence insufficient to sustain the conviction of manslaughter in the second degree or any lesser included offense, which would include, of course, criminally negligent homicide. Noting the possibility that a disagreement might have led to a heated argument, prompting the defendant to seize the weapon in order to threaten the deceased, the Court found that it was equally possible that the production of the gun was unrelated to any disagreement, "perhaps displayed in friendship and carelessly discharged as a result of ordinary negligence." *(Supra,* at 57.) Most significantly though, the Court found that "even assuming that the weapon was in the defendant's hand at the time of the shooting, neither this circumstance nor any other factors in the case compels the inference that the manner in which the defendant handled the weapon, if negligent, rose to the level of a criminal act [citation omitted]." *(Supra,* at 57-58.)

Here, as in *Montanez (supra),* defendant and the deceased were alone at the time of the shooting and defendant is the only witness to the event. Similarly, as in *Montanez,* defendant testified that the gun was in the deceased's possession

before discharge and that the gun discharged when he, the defendant, reached over to take it from the deceased. Also, like *Montanez,* the People's witnesses saw defendant with the gun only after the shooting. Indeed, defendant's testimony that the deceased was the one in possession of the gun before the shooting went unrebutted. William Owes, a prosecution witness, unequivocally testified that he did not see either defendant or the deceased with a gun during the 45 minutes that he was with them immediately prior to the shooting. The discovery of a .357 round in the deceased's pocket only served to corroborate defendant's testimony on this point.

The dissent points to William Owes's testimony that the gun belonged to defendant and concludes that defendant's placing the gun in Calvin's possession while the latter was in an intoxicated state is sufficiently blameworthy to support the conviction of criminally negligent homicide. This novel theory is presented for the first time on appeal. The People's theory at trial was that defendant fired the fatal shot, and that was the theory on which the count of criminally negligent homicide was submitted to the jury. In any event, even if the jury were to conclude that the gun was defendant's, there is no evidence that he placed it in Calvin's hands. As noted, the only eyewitness testimony is that the gun was in Calvin's possession at all times until moments before the shooting. Thus, the dissent's conclusion that defendant "plac[ed] the gun in decedent's possession" is sheer speculation, and we decline to sustain the conviction on such a tenuous ground. And, while displaying a weapon or making it accessible in the presence of an intoxicated person—the most unfavorable inferences which can be drawn from the evidence—may be an exercise of poor judgment, this conduct hardly rises to the level of "blameworthy conduct creating or contributing to a substantial and unjustifiable risk of death" *(People v Boutin,* 75 NY2d 692, 696, *supra),* which is required to support a conviction for criminally negligent homicide.

Nor did defendant's statements to the deceased's family immediately following the incident contradict his trial testimony. According to defendant, the shooting occurred when he reached over to take the gun from the deceased. As he touched either the gun or the deceased, the gun discharged. Such a sequence of events could well lead defendant, 16 years old at the time, to believe that he had accidentally shot his best friend. Thus, the testimony of the deceased's sister, similar to that of Owes, that the defendant came frantically

running into the apartment yelling, repeatedly, "I made a mistake and shot Cal", fell far short of establishing that defendant's conduct rose to the level of criminal negligence.

Moreover, the testimony of Dr. Pearle, the Deputy Medical Examiner, all but conclusively confirmed defendant's description of the manner in which the shooting occurred. Most notably, Dr. Pearle testified that the single shot had been fired at close range, that is, from a distance of anywhere from one inch to two feet, but most surely closer than two feet. That the bullet travelled upward through the deceased's body is not, as the dissent speculates, inconsistent with defendant's testimony that the deceased was pulling the gun from his waistband when it discharged. There is no testimony as to how far out of his waistband the gun was at the point of discharge or the direction in which it was pointed. Significantly, the People did not, either through the testimony of Dr. Pearle or any other witness, attempt to posit the theory advanced by the dissent that the upward path of the bullet in the deceased's body belies defendant's account of the shooting. In this connection, it is noteworthy that Dr. Pearle did not observe in or around the wound any fibers, which would have been present had the bullet passed through apparel before entering the deceased's body, as would have been the case had defendant fired the gun.

Furthermore, it should be noted, although defendant, as he acknowledged both at trial and to the deceased's family the day after the shooting, lied to the police, his conduct otherwise suggested that what happened that evening in front of 2352 Walton Avenue did not rise to that level of serious blameworthiness on defendant's part that is essential to a finding of guilt of criminally negligent homicide. His first thought was to run to the apartment of the deceased's family. It was defendant who summoned an ambulance to the scene and it was defendant who hailed a passing patrol car.

Finally, the dissent makes much of the fact that defendant and the deceased had been drinking before the incident. While there is no evidence as to whether defendant was intoxicated at the time, the record reflects that the deceased's blood alcohol level on autopsy was .17%, "a pretty high level", which, Dr. Pearle noted, "would have [a]ffected [the deceased's] mood, his coordination, his fine motor control". This evidence does not at all detract from defendant's version of the shooting and, if anything, supports it.

Since the issue of legal insufficiency is fully preserved for appellate review, defense counsel having moved for a trial order of dismissal at the close of the People's case and having cited *Montanez (supra)*, the conviction of criminally negligent homicide should be reversed and the charge dismissed.

Accordingly, the judgment of the Supreme Court, Bronx County (George D. Covington, J.), rendered January 9, 1992, convicting defendant, after a jury trial, of criminal possession of a weapon in the third degree and criminally negligent homicide and sentencing him to concurrent indeterminate terms of imprisonment of from 2⅓ to 7 years and 1⅓ to 4 years, respectively, should be reversed, on the law, the count charging criminally negligent homicide dismissed and the matter remanded for a new trial on the remaining count.

Tom, J. (dissenting in part). On the evening of June 14, 1990, defendant Donald Lowe had been drinking ouzo (a powerful Greek liquor) and beer with his friends Calvin Johnson (Calvin), as well as William Owes and others, on the stoop in front of the building designated as 2352 Walton Avenue, Bronx, New York. At some point, Mr. Owes left the group and went upstairs into the apartment (the Apartment) he shared with Calvin; Calvin's sister, Calvina Johnson; and Calvin's father, Calvin Johnson, Sr. (Mr. Johnson).

At approximately 11:00 P.M. that same evening, Calvina was mopping the floor when she heard the doorbell ring quickly and repeatedly. Defendant thereafter entered the Apartment in a frantic, panicky and nervous state and told her and Mr. Owes that he had mistakenly or accidentally shot Calvin. At that time, defendant held a "big black gun", a .357 Magnum revolver, which was approximately 8 to 10 inches long. Defendant exclaimed that he needed to hide the gun and he then attempted to place it in a closet.

Calvina went downstairs, accompanied by defendant, to check on her brother and saw Calvin sitting in a corner with his eyes closed. Calvina then went back into the Apartment to get a quarter in order to call an ambulance, and defendant ran around the corner, also to summon an ambulance. During this time, Mr. Johnson proceeded downstairs and saw his son sitting in front of the building with his legs stretched out in front of him. Calvin was not breathing and had no pulse, and Mr. Johnson stated that he observed powder burns on Calvin's chest when he lifted his shirt.

Defendant flagged down New York City Police Officers

Smith and Koellner, and informed the officers that he had gone upstairs to the Apartment to retrieve a cassette tape and, while he was returning to the stoop, he heard a loud noise. Defendant continued that when he exited the building, he discovered that his friend had been shot. Detective James Davey testified that he subsequently interviewed defendant in the 46th Precinct and was told essentially the same story that defendant told the other police officers.

Defendant was thereafter indicted for manslaughter in the second degree, criminally negligent homicide, criminal possession of a weapon in the second and third degrees, and criminal use of a firearm in the second degree.

At trial, defendant testified that Calvin was a "close friend" whom he had known for three or four years and with whom he played sports and video games and rode bicycles. Defendant averred that on the day in issue, he met Calvin at the Apartment between 2:30 P.M. and 3:00 P.M. and, after approximately one half hour, they went to visit defendant's friend, David Gray, on the Upper West Side of Manhattan. Gray subsequently produced a sneaker box containing various handguns and, after some discussion, Gray gave decedent a long, black .357 Magnum and a handful of bullets. Defendant averred that Calvin placed the gun in his waistband and the bullets in his pocket after which time defendant and Calvin left Gray's apartment and went to defendant's apartment to pick up a cassette tape.

The two young men then took the subway to Calvin's neighborhood, bought alcohol at a liquor store and went to decedent's building where they encountered Mr. Owes and began drinking on the stoop. Defendant testified that after Mr. Owes went upstairs, Calvin began "fooling with" the gun and kept pulling it out of his waist area and holding it in front of him. Defendant maintained that he told Calvin to stop and to put the gun upstairs in the Apartment, after which admonishment Calvin retreated upstairs, only to return 10 or 20 minutes later to begin playing with the gun again.

Defendant asserted that he once more told Calvin to put the gun away and when he tried to stop decedent from pulling it out, it discharged at which time defendant allegedly grabbed the gun from under Calvin's shirt and eased him to the ground. Defendant then ran upstairs holding the gun, purportedly because he did not want the police to find it on the decedent.

Defendant was convicted of the aforestated charges and now appeals his conviction based on various grounds. First, defendant contends that the conviction of criminally negligent homicide was legally insufficient based on the evidence presented and cites *People v Montanez* (41 NY2d 53) in support of his contention.

In *Montanez,* during a social gathering, two adult men, who had been friends for 20 years, were quietly conversing (two witnesses characterized the discussion as a disagreement) in a kitchen adjoining another room occupied by a small number of friends when a loud pop was heard followed by one of the men staggering out of the kitchen holding his neck with a bloody hand. The decedent, according to the accounts of two witnesses, stated " '[w]hat did you shoot me with?' " followed by defendant's exclamations that he did not mean to do it, he " 'just wanted to show it to him.' " *(Supra,* at 55.) Defendant then got on his knees and began hugging the mortally wounded man and crying. One witness testified that defendant had a small revolver in his hand when he emerged from the kitchen and that he placed the weapon in his pocket prior to leaving the house. Defendant denied the account and conceded that although the gun may have been in his hand when it fired, it belonged to the decedent. Defendant testified that as he turned to leave the room, decedent said, " 'I got a nice piece to show you' " and that as he took the gun from decedent, it went off *(supra,* at 56).

The *Montanez* Court held that the evidence was insufficient to sustain the conviction for the crime charged and stated that even assuming that the weapon was in the defendant's hand at the time of the shooting, there was insufficient proof to support the inference that the manner in which defendant handled the weapon, if negligent, rose to the level of a criminal act.

Penal Law § 125.10 provides, "A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person." "Criminal negligence", with respect to a certain result, is defined in Penal Law § 15.05 (4) as the failure "to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

In *People v Boutin* (75 NY2d 692, 696), the Court of Appeals held that case law as well as the statutory language makes it abundantly clear that criminally negligent homicide "requires not only a failure to perceive a risk of death, but also some serious blameworthiness in the conduct that caused it". The statute serves to provide an offense which is applicable to conduct considered socially undesirable *(People v Haney,* 30 NY2d 328, 334). The ultimate harm must be something which the defendant should, under the circumstances, have plainly "foreseen as being reasonably related to [his] acts" *(People v Kibbe,* 35 NY2d 407, 412; People v Galle, 77 NY2d 953, 955).

In the *Montanez* case, there was insufficient proof to support the elements of criminally negligent homicide pursuant to Penal Law § 125.10 where the evidence established that the defendant had failed to perceive a substantial and unjustifiable risk of death and there was no serious blameworthiness in his conduct which resulted in decedent's death. The only evidence on point was defendant's testimony that decedent showed him a pistol and that when he took the gun from decedent's hand it accidentally went off. The factual situation in this case is clearly distinguishable.

In determining whether the evidence presented at trial supports a charge of criminally negligent homicide, the evidence must be viewed in the light most favorable to the People and it must be given the benefit of every reasonable inference to be drawn therefrom *(People v Contes,* 60 NY2d 620; *People v Way,* 59 NY2d 361; *People v Kennedy,* 47 NY2d 196, 203; *People v Crespo,* 198 AD2d 85, 86, *lv denied* 82 NY2d 923).

In the matter at bar, there is no dispute that beer, hard liquor and perhaps a small amount of marihuana were consumed by defendant and the decedent immediately prior to the shooting, and, while there is no toxicology report concerning defendant, decedent's blood-alcohol level was .17%, which Dr. Pearle, a witness from the Medical Examiner's Office, characterized at trial as rendering the decedent "intoxicated". Further, evidence was submitted, by way of the testimony of Mr. Owes, that the gun he saw on the night of the shooting belonged to defendant and that defendant had shown him the gun within the past year. Mr. Owes testified that the gun in issue was a long-barrelled .357 Magnum, which statement was further buttressed by his testimony that he was familiar with that type of firearm and had fired one before in order to compare it to a .44 Magnum. The foregoing testimony of Mr.

Owes must also be viewed in conjunction with the testimony of Mr. Johnson, an ex-Marine, who averred of his close relationship with his son and the fact that if Calvin had a handgun, he would have shown it to his father, as both father and son were gun enthusiasts.

Pursuant to the evidence presented in the present case, a jury could have reasonably found that the gun in issue was owned by defendant and that by placing the gun in decedent's possession while he was in such an intoxicated state, defendant created a substantial and unjustifiable risk of death, thereby resulting in the blameworthy conduct which ultimately caused decedent's death. The fact that defendant immediately took possession of the gun after the shooting and attempted to hide it and later discarded it could be viewed as further supporting his ownership of the weapon.

Defendant's testimony was also somewhat at odds with the forensic evidence and raises an issue as to how decedent was shot. Dr. Pearle testified that "the bullet entered [decedent's] right nipple and went toward his back * * * and slightly upward or slightly toward his heart." This testimony contradicts defendant's version of how the shooting occurred. Defendant stated that decedent was "fooling with the gun" by pulling it out of his waistband and holding it out in front of him. Defendant testified that Calvin again began to pull the gun out of his waistband and defendant "just did like this [later described for the record as sticking his left arm out to the side at waist level] like stop and it went off pow * * * then I grabbed him and * * * let him down slowly and I had grabbed the gun from under his shirt and I ran up the stairs". Defendant further testified that when the shot went off the gun was still "stuck in his shirt."

If, in fact, the decedent was again beginning to *pull* the gun out of his waistband, it is unclear why or how the bullet took an upward track which entered in the upper region of the torso. Since the bullet's entry into decedent's chest was slightly upward toward his back, the pistol would have had to be pointed at decedent at the time of its discharge. This would not be consistent with defendant's testimony that the gun had discharged while decedent was removing it from his waistband or that the gun was still "stuck in his shirt" when it went off.

Lastly, defendant testified, as did Mr. Owes and Calvina Johnson (defendant said "I made a mistake and shot Cal"), that upon entering the Apartment, defendant exclaimed that

he (albeit mistakenly or accidentally) had shot Calvin. This occurred while defendant, indisputably in possession of the gun, tried to hide it before the police arrived. The gun was eventually discarded and, apparently, never found.

In summary, defendant and decedent were consuming copious amounts of alcoholic beverages when, while "fooling" with a loaded handgun which testimony indicated belonged to defendant, Calvin was fatally shot. Whether or not the shot was intentional, the fact that sufficient evidence was presented to convince a jury that defendant owned the gun, coupled with the fact that decedent and defendant were both drinking alcohol while grabbing and possibly wrestling over a loaded firearm, indicates blameworthiness (*People v Boutin, supra*). Such conduct can clearly be characterized socially undesirable and of a class which the statute seeks to proscribe (*People v Haney, supra*). I disagree with the majority and find that the charge of criminally negligent homicide should not be dismissed.

I do agree with the majority, however, that the trial court improperly discharged and replaced a sick juror who was expected to return on the next trial day.

During the course of this brief trial, opening statements and initial testimony took place on Monday, December 9, 1991. On Tuesday, no trial session was held as it was the court's calendar day and on Wednesday, there was no trial session due to a juror's illness. As a result of the juror's illness, the court adjourned the case to Thursday. On Thursday, December 12th, the People completed their case and the court announced its intention to have the defense present its case beginning Friday morning to be followed by the summaries and jury charge on Monday.

On Friday, December 13th, however, a different juror called the IAS Part clerk and explained that he was sick and could not be present "today". The court immediately substituted an alternate for the sick juror, to which the defense objected, arguing that there was nothing left but the defendant's testimony and that the absent juror could be expected to return for the next trial date. The court thereafter ruled:

"Let the record reflect that I've thought about what you've had to say and I've thought about the previous juror and I recognize this is a week before holiday weekend.

"I don't want to start a dangerous precedent and I think it time I nip this thing in the bud right now. I'm going to substitute a juror and put in alternate number one."

As a result, the defendant testified on Friday, the jury was given the case on Monday and a verdict was reached on Wednesday convicting defendant of criminally negligent homicide and criminal possession of a weapon in the third degree.

In *People v Page* (72 NY2d 69, 73), the Court of Appeals held that:

"The statute here—in requiring the discharge of a juror who is unavailable for continued service 'by reason of illness or other incapacity, or *for any other reason*' (CPL 270.35 [emphasis added])—invests a trial court with latitude to make a balanced determination affecting the administration of justice based on the facts required to be adduced, recognizing that criminal proceedings should not be unnecessarily or unfairly delayed against the interests of either the defense or the prosecution * * *.

"No inflexible rule or catechism was contemplated or need be judicially crafted to determine the precise parameters of when a juror is unavailable under this statutory prescription. Rather, illustrative factors that may be considered in making such determinations include *the stage of trial, the expected length of the absence of the juror if known, whether the juror's return is ascertainable and reasonably imminent and certain, whether reasonable attempts have been made to locate the absent juror,* and other relevant circumstances such as the continued availability of key witnesses. *A trial court's decision dismissing a juror must safeguard the important right of a defendant to be tried by jurors in whose selection the defendant has had a voice.* It thus necessitates a reasonably thorough inquiry and recitation on the record of the facts and reasons for invoking the statutory authorization of discharging and replacing a juror based on continued unavailability." (Emphasis added; *see also, People v Brown,* 194 AD2d 443, in which this Court held that the trial court's failure to conduct a " 'reasonably thorough inquiry' " into when and whether an ill juror would be able to continue was reversible error; *People v Hines,* 191 AD2d 274, *lv denied* 81 NY2d 1074, in which this Court held, *inter alia,* that the trial court should have inquired as to the degree of unavailability of a juror experiencing financial difficulties; *People v Rodriguez,* 185 AD2d 198, in which this Court held that the decision to discharge a juror must be supported on the record by the reasons or facts for such discharge; *People v Powell,* 179 AD2d 599, *affd* 80 NY2d 852, in which this Court reversed defen-

dant's conviction because the court failed to inquire as to the juror's availability to attend trial the next day; *People v Dunn,* 169 AD2d 394, in which this Court reversed defendant's conviction and ordered a new trial because the court failed to ascertain the details of the juror's incapacity or make a record of its efforts and the results; *People v Olaskowitz,* 162 AD2d 322, *lv withdrawn* 76 NY2d 1023, in which this Court ordered a new trial because the trial court made no discernible inquiry and hastily replaced a juror simply because the juror advised the clerk that he or she was sick that day.)

In the matter before us, the trial court apparently failed to conduct any inquiry, thorough or otherwise, to ascertain the expected length of the juror's absence or the nature thereof. Rather, the trial court seemed intent on avoiding a short delay (one day) and, had the court waited until Monday, the defendant's testimony as well as the summations and jury charge could either have been squeezed in one day or, at the very least, the case could have been given to the jury on Tuesday instead. The court's reference to the holidays is misplaced as the holiday break was not scheduled to start until the following Monday, a full week after the day scheduled for the summations and charge. Instead, the court's primary concern appeared to be to use the substitution of the alternate to avoid a brief interruption of the trial, which without other prejudicial factors, cannot outweigh defendant's right to be tried by the jury selected originally.

It is also important to note, and beyond dispute, that the trial was near conclusion at the time the juror called in sick which, in the words of the eminent Justice Kupferman of this Court, should have "counseled patience" *(People v Galletta,* 171 AD2d 178, 180, *lv denied* 79 NY2d 947). Such was not shown herein. Since the defendant was denied his right to a trial by the jury as selected by the People and the defendant *(see, People v Page, supra,* at 73), the conviction must be reversed and the matter remanded for a new trial.

Finally, I agree that the trial court properly denied defendant's request for a jury charge that he temporarily lawfully possessed the handgun. While such a theory excuses a defendant from criminal liability for the possession of a weapon he had "wrested" away from another, in the matter at bar it is undisputed that defendant retained possession of the weapon after the shooting, took it to another location, tried to hide it, and eventually discarded it. By retaining possession of the

weapon in the foregoing manner, which was "at odds with any claim of innocent possession" *(People v Williams,* 50 NY2d 1043, 1045), the defendant's right to a temporary lawful possession charge was defeated *(People v Banks,* 76 NY2d 799; *People v Snyder,* 73 NY2d 900).

MURPHY, P. J., ROSENBERGER and NARDELLI, JJ., concur with SULLIVAN, J.; TOM, J., dissents in a separate opinion.

Judgment, Supreme Court, Bronx County, rendered January 9, 1992, reversed, on the law, the count charging criminally negligent homicide dismissed and the matter remanded for a new trial on the remaining count.