| **Estate of Bux** |
| 2024 NY Slip Op 34583(U) |
| December 19, 2024 |
| Surrogate's Court, Bronx County |
| Docket Number: File No. 2019-2267/A |
| Judge: Nelida Malave-Gonzalez |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SURROGATE'S COURT, BRONX COUNTY

December 19, 2024

ESTATE OF JOSEPH S. BUX, Deceased
File No.: 2019-2267/A

In this contested probate proceeding, the proponent, the decedent's son Christopher Bux ("Christopher"), refiled a motion seeking summary judgment dismissing the prior objections and supplemental objections filed by another son, Joseph Bux, Jr. ("Joseph Jr."), to the probate of the decedent's will dated September 17, 2019. The court denied, without prejudice, Christopher's previous summary judgment motion requesting the court to dismiss Joseph Jr.'s prior objections on the grounds, inter alia, that discovery was then incomplete, there were significant issues concerning testamentary capacity and it was premature to assess the objections concerning due execution, fraud and undue influence (see Matter of Bux, NYLJ, Dec. 27, 2021 at 17, col 2 [Sur Ct, Bronx County 2021]).

Christopher then retained new counsel who filed an order to show cause seeking to restore the summary judgment motion to the calendar. That application was granted on consent of Joseph Jr.'s attorney, who was thereafter granted leave to withdraw (see Matter of Bux, NYLJ, Feb.

16, 2024 at 18, col 2 [Sur Ct, Bronx County 2024]). Joseph Jr. now proceeds self-represented. Christopher avers that discovery is completed and the testimony contained in the filed transcripts of the SCPA 1404 examinations of the attesting witnesses, Gerald Sheiowitz, Esq., the attorney draftsperson ("Sheiowitz") and Hillary Sheiowitz ("Hillary"), Sheiowitz' daughter who works as a paralegal in his law office, supports the granting of summary judgment dismissing all of the objections.

In determining the refiled application, the court searched the record and reviewed all of the prior submissions, including the prior objections and pleadings with exhibits; the affirmation and memorandum of law of Lucy F. Titone, Esq. in support of summary judgment annexing Sheiowitz' and Hillary's SCPA 1404 examination transcripts; the "supplemental verified objections" verified on the 26th day of April, 2024; Joseph Jr.'s supplemental affidavit in opposition to summary judgment sworn to on the 25th day of April, 2024 annexing affirmations from the decedent's former spouse, Joyce Kelly; the decedent's brother, Michael Bux; a nephew, Michael Bux, Jr.; a niece, Stephanie Bux; and decedent's co-workers at a Pepperidge Farm depot, Marshal Harris and Patrick Gooding; Christopher's reply affidavit sworn to the 6th day of May, 2024; affirmation of Lucy F. Titone, Esq. dated May 6, 2024 with exhibits; and Sheiowitz' affidavit in support  dated May 5, 2024 with exhibits.

**Background**

The extensive history of the proceedings is detailed in the prior

decision denying summary judgment dismissing the objections (see Matter of Bux, NYLJ, Dec. 27, 2021 at 17) and will not be repeated herein except for illustrative purposes as follows:

> "The decedent died on October 1, 2019 at age 72. His distributees are the two sons and an estranged spouse for whom a waiver and consent was filed. The will was executed less than two weeks prior to the decedent's death from cancer and was attorney supervised with a self-proving affidavit. The decedent's signature on the instrument is shaky. The instrument bequeaths a bread route owned by the decedent and associated equipment, three parcels of realty located in upstate, New York and the entire residuary estate to the proponent and specifically makes no provisions for the objectant and the estranged spouse. On the same date that the will was signed, the decedent executed a durable power of attorney in favor of the proponent and a separate document conferring authority to certain gift transactions. It is not known whether such gifting authority was exercised. He also executed a health care proxy appointing the proponent as agent on September 21, 2019. Preliminary letters testamentary issued to the proponent on November 17, 2019."

**Christopher's Contentions in Support of Summary Judgment**

In support of the refiled summary judgment application, Christopher's attorney avers that the will was attorney drafted and supervised when duly executed by the decedent on September 17, 2019, the decedent possessed testamentary capacity at all of the relevant times and he indicated to others for many months prior to the will's execution the reasons for making Christopher his sole testamentary beneficiary. Accordingly,

Christopher urges that there is no issue of undue influence or fraud. In further support, counsel annexes transcripts of the SCPA 1404 examinations of Sheiowitz and Hillary. Hillary Sheiowitz ("Hillary S."), who works as a paralegal in his law office.

**(1) There Was Extensive Pre-Execution Planning**

Sheiowitz testified that he practiced law for over 52 years focusing on estates, real estate and guardianships. He recollected that the decedent contacted him by telephone in or about May of 2019, asked him to draft a will and scheduled an in-person appointment. However, the decedent had to cancel this and several subsequent meetings as he was "not feeling well." During this time, they had several telephone discussions concerning what the decedent wanted "to put in the will." Sheiowitz personally met two times with the decedent at The Hebrew Home for the Aged in Riverdale("The Hebrew Home"). The first in person meeting was in June or July 2019 and the second was on the date the will was executed. The first time they reviewed the attorney's notes from the prior telephone conferences and Sheiowitz told the decedent that he would draft the will consistent with his indicated wishes that the disposition of the estate was "all to Christopher." The decedent specifically noted that his estate consisted of a "bread route" as well as three upstate properties, one in Middletown, New York and two in Deposit, New York, but he was not sure whether they still belonged to him as there were foreclosure proceedings, but he wanted to list all of them in the will. Sheiowitz also testified that his notes state "another child

[* 4]

Joseph–nothing. For reasons best known to me." The decedent also stated that he wanted to exclude his wife Irene "because of a prior arrangement" and ascribed the reason for disinheriting Joseph because "he is a criminal, a convicted felon, and that he gave him so much money, which would be more than half his inheritance" and "paid a lot of his legal fees over the years." The decedent also discussed having a power of attorney with a gift rider because he "wanted to make sure that his son [Christopher] gets everything."

Although Sheiowitz acknowledges he discussed scheduling meeting details with Christopher, he avers that they did not discuss any of the decedent's assets or estate plan. On September 17, 2019, the date of execution, Sheiowitz and Hillary went into the decedent's room and the decedent was in a hospital bed. The only other person in the room was a patient in the next bed. He asked the decedent whether he was ready to sign his will and the decedent answered "Yes." Sheiowitz then handed the will to the decedent, who put on glasses and silently read over all of the provisions of the will while sitting up with his knees up. Sheiowitz then put a file folder underneath the will to have a "base" for signing. He also testified that he would never continue a will execution ceremony if a testator appeared to lack testamentary capacity. The decedent also reviewed a power of attorney in favor of Christopher and gift rider, initialed the instruments at various places and signed those documents.

Hillary testified that although Christopher supplied the

addresses for the decedent's brother and spouse and scheduling details, she never observed Sheiowitz and Christopher discussing the decedent's medical condition, assets or dispositive wishes. At the first meeting with the decedent, she and Sheiowitz arrived at The Hebrew Home, signed in, went directly to the decedent's room and proceeded to speak with him about what he wanted to put in his will. The decedent stated that there were three properties, there might be a partnership interest and one property may have been "lost through foreclosure." There was also a Pepperidge Farm bread route and no other substantial assets. The decedent also stated that although he was separated from his spouse for over 10 years, they remained legally married. He got very agitated when speaking about his son Joseph Jr. and emphasized that he was a convicted felon who had been in two different "jails." The decedent noted that he paid over $100,000 for Joseph's legal representation, helped him throughout his life and "he already received his inheritance." He wanted to leave everything to his son Christopher, who had been "there for him" and "was a good guy."

**(2) Due Execution**

According to Hillary's SCPA 1404 testimony, on September 17, 2019, the date of execution, Hillary and Sheiowitz went to The Hebrew Home. There was a doctor in the hallway with a chart outside the decedent's room. Hillary told the doctor that they were there to have the decedent sign some legal documents and she asked how the decedent was. The doctor replied "He's lucid. You can go in." Once in the room, Sheiowitz asked the

decedent "How are you doing?" The decedent responded that he had a recent surgery and had been through a lot, but he "felt okay." There was another patient in the room, and they pulled the curtain for privacy. After asking the witnesses for his eyeglasses and to raise his bed, the decedent proceeded to read the will. After Sheiowitz placed another file folder under the will, the decedent propped up his legs so it was "like a desk." Hillary recollected that after the decedent signed the will, she and Sheiowitz filled out an affidavit at the law office and their signatures were notarized.

**(3) The Decedent Possessed Testamentary Capacity**

Addressing Joseph Jr.'s allegations that the decedent had "a long history of depression medications and psychotherapy with cancer diagnosis and treatment, and that he was sad and scared with significant fluctuation in mental status," Christopher's attorney opines that the medical records from The Hebrew Home reflect that although the decedent had mild memory impairment and his condition fluctuated, he knew the year and month. On September 16, 2019, the day before the will execution, there is a notation in the decedent's medical record by Dr. Resmi Sulekha, the physician whom Hillary described as "Dr. Sulek" who advised the witnesses in the hall that the decedent was lucid, that the decedent "had on and off mental status." The observations made on September 17, 2019 by another physician, Dr. Goldstein note without explanation, that while the decedent "was oriented as to place and time, his attention, concentration, insight and judgment were impaired." These observations were made at 3:48 p.m.,

several hours after the will was executed in the late morning.

Counsel notes that none of the medical observations other than the "lucid" pronouncement concern the decedent's condition at the time the will was signed, and the only inquiry concerning testamentary capacity is whether the decedent was lucid and rational at the time the will was made. Counsel concludes that the medical documentation coupled with the statements of the physicians and nurses at The Hebrew Home on the date of execution clearly indicate that the decedent possessed testamentary capacity.

**(4) Lack of Undue Influence and Duress**

Counsel concludes that the claim of undue influence and duress are also meritless, given Sheiowitz's testimony that Christopher had no input into testamentary planning and that the attorney never met him prior to the decedent's directing Sheiowitz to prepare a will months prior to the date of execution. Counsel urges that it is clear from the SCPA 1404 examinations that the decedent wanted to bequeath his entire estate to Christopher, whom he characterized as a "good guy" who took care of him, to the exclusion of his estranged wife and Joseph Jr., a convicted felon whom he already gave approximately $100,000 for legal fees.

**Joseph Jr.'s Opposition**

**(1) Lack of Testamentary Capacity**

In opposition to summary judgment, Joseph filed an affidavit

stating, inter alia, that his objection to the will is "simple." He asserts that the decedent was administered the opioids Fentanyl, Oxycodone and OxyContin at the time the will was executed and lacked testamentary capacity. Joseph Jr. urges that his exclusion as a beneficiary, although he is a son of the decedent and "helper" for many years demonstrates lack of capacity. He refers to the court's prior decision denying summary judgment upon review of medical records submission noting the decedent had a long history of depression, was administered medications and psychotherapy "with significant fluctuation of actual state" and that because of OxyContin and Oxycodone "his attention, concentration, insight and judgment were impaired, his mental state was "on and off, and he hallucinated."

In further opposition, Joseph Jr. annexes notarized affirmations from the decedent's brother, Michael Bux, a nephew, Michael Bux, Jr. ("the nephew") and two nieces, Michelle Bux and Stephanie Bux"the two nieces"), to refute Sheiowitz' and Hillary's testimony that the decedent raised his leg to make a "shelf" where the will could be signed as a physical impossibility upon prior observation of his severely deteriorated condition.

The nephew's affirmation states that during his last visit with the decedent at The Hebrew Home several weeks prior to his death, the decedent was in pain despite taking many medications, and "he was not in the right state of mind at all, mentally and physically." He wore a diaper, could not get up or roll over and thought the nephew was his son Joseph Jr. As the decedent always expressed love for all of his children, and Joseph Jr.

always helped him with money and in other ways, the nephew cannot fathom how he would "just give everything to Christopher."

**(2) The Will was Procured by Undue Influence**

In support of the allegation of undue influence, Joseph Jr. notes that although Christopher maintains that only Joseph Jr. was not permitted to visit the decedent at the Hebrew Home during his final illness, other relatives and close friends were also barred from visiting for several weeks prior to the date of death. He annexes the affidavits of his mother Joyce Kelly ("the former spouse") and the decedent's friend and caretaker, Angela Boniello, stating that they were also refused entrance to The Hebrew Home shortly before the decedent's death, upon Christopher's instruction. As the decedent begged the former spouse to "make sure you come back" during her last visit, she cannot fathom why she was prevented from returning.

Joseph Jr. urges that Christopher excluded everyone close to the decedent from comforting and taking care of him so that Christopher would appear to be the only interested, caring family member and be designated the decedent's sole heir. The former spouse adds that although the decedent did pay some of Joseph Jr.'s legal fees, she remortgaged her own home to pay the remainder. She and the decedent often visited Joseph Jr. together while he was incarcerated in Brooklyn. During those visits, the decedent would remark how much Joseph Jr. helped him and that he "wanted Joe to have his business." The former spouse notes that Joseph Jr.

paid the legal fees involving criminal proceedings in Rockland County concerning the second spouse's business and also for matrimonial proceedings with the second spouse, without repayment.

**Christopher's Reply**

Christopher's reply affidavit refutes the lack of access by family members other than Joseph Jr., who was denied entry to The Hebrew Home after he "made a scene" and had to be escorted from the premises. Christopher notes that, although he had a tumultuous childhood and his mother "threw him out" at the age of 16, and his parents failed to support him; nonetheless, he was self-supporting, graduated from college and received a doctoral degree in physical therapy. He is married with two children and owns a home. The decedent was proud of his accomplishments and maintained a close relationship with Christopher and his family.

Joseph Jr., on the other hand, was always a handful. He was involved with drug dealing at an early age. Christopher alleges that when the decedent remarried, Joseph Jr. "forged" deed transfer documents changing the house from the decedent's sole name to himself and took the decedent and the second spouse to court. As a result, Joseph Jr. paid the second spouse for her half interest in the realty and claimed that he should be the sole owner because he previously lent money to the decedent. He also removed the decedent and Christopher from the decedent's home and moved the first spouse there.

Christopher alleges that the decedent had no further contact

with Joseph Jr. for the next 10 years, four of which Joseph Jr. was incarcerated in federal prison. The decedent found out that Joseph Jr. had multiple suicide attempts and paid over $100,000 in legal fees to expedite his release. Although the decedent allowed him to work in the bread route, Joseph Jr. was of no help. He accumulated parking tickets, stole money and crashed the bread truck leaving the decedent without a license and unable to work for a year. When the decedent was diagnosed with kidney cancer, Christopher and the decedent's brother, Alexander Bux ("Alexander"), took care of him. Joseph Jr. did not help out in any way, and the decedent had no contact with him until several weeks prior to his death.

Christopher stresses that the decedent was cognitively intact during his visits with him at The Hebrew Home. The decedent continued to state during many conversations with Christopher and his family that he was proud of Christopher's accomplishments despite his earlier challenges, and he was sorry that he was unable to help pay for Christopher's schooling and wasted so much money and time on Joseph Jr.

In further reply, Christopher's attorney annexes a copy of an undated letter from Christopher to the Hebrew Home with a list of the persons authorized to visit the decedent that expressly excludes Joseph Jr. as of September 20, 2019. Counsel alleges that Joseph Jr. was barred from visiting The Hebrew Home only for the last week of the decedent's life because of the aforesaid violent outburst. Also submitted is Sheiowitz's affidavit referencing an annexed photograph of the decedent reading the will

at the time of execution.

Christopher also submits the affidavit of the decedent's brother Alexander, who is a nurse practitioner for over 30 years and a professor at Lehman College, stating that, in his opinion as a credentialed medical professional, although the decedent was in pain, he was lucid, engaging and aware of his visitors and was able to communicate until the day before his death. Annexed is a photograph of the decedent standing next to Alexander beside a hospital bed taken approximately two weeks prior to his death. Alexander reiterates that the decedent wanted Christopher to receive his entire estate because he gave Joseph Jr. over $100,000 for legal fees and Joseph Jr. had "taken his home" and remained estranged when his grandmother, the decedent's mother, was dying.

In conclusion, Christopher submits the affidavit of Irene Danyushenko, the decedent's second spouse ("Irene") stating that although she was separated from the decedent for many years, they remained friends and stayed in touch. She and the decedent bought a house together in West Nyack, New York in 2003 and lived there happily with her son and Christopher until Joseph Jr. moved in. Joseph Jr. hid large amounts of cash and guns in the house, picked fights with her son who was only 13 years old at the time and threatened to kill Irene and her son if she did not sign her interest in the house over to the decedent and leave. Fearing for both their lives, Irene and the son fled with only the clothes on their backs and never returned. Although Irene signed over her entire interest in the realty to the

decedent as requested, she was only partially compensated months later. Joseph Jr. Subsequently commenced an eviction proceeding against Christopher and the decedent. As a result, the decedent had to move back into his mother's small one bedroom apartment in the Bronx. Irene concludes that the decedent "hated Joseph Jr. for this" and that she never saw him visit the decedent at the hospital or "do anything nice for him."

**Summary Judgment**

Summary judgment cannot be granted unless it clearly appears that no material issues of fact exist (see Phillips v Joseph Kantor & Co., 31 NY2d 307 [1972]; Glick & Dolleck, Inc. v Tri-Pac Export Corp., 22 NY2d 439 [1968]). The movants must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence in admissible form to demonstrate the absence of any material issue of fact (see Alvarez v Prospect Hosp., 68 NY2d 320 [1986]; Friends of Animals, Inc. v Associated Fur Mfrs. Inc., 46 NY2d 1065 [1979]). When the movants have made out a prima facie case, the burden shifts to the party opposing the motion to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact (see Zuckerman v City of New York, 49 NY2d 557 [1980]). Summary judgment is a drastic remedy which requires that the party opposing the motion be accorded every favorable inference and issues of credibility may not be determined on the motion but must await the trial (see F. Garofalo Elec. Co. v New York Univ., 300 AD2d 186 [1st Dept 2002]).

**Burden of Proof**

In a contested probate proceeding, summary judgment is appropriate where a petitioner establishes a prima facie case for probate and the objectant fails to raise a triable issue of fact concerning the viability of the will (see Matter of Moskowitz, 116 AD3d 958 [2d Dept 2014]); Matter of Sabatelli, 161 AD3d 872 [2nd Dept 2018]).

The proponent of a will has the burden of proving that the propounded instrument was duly executed in conformance with statutory requirements (see EPTL 3-2.1 [a]; Matter of Schmidt, 194 AD3d 723 [2nd Dept 2021]; Matter of Bux, NYLJ, Dec. 17, 2021 at 17, col 12 [Sur Ct, Bronx County 2021]).

The proponent must also establish that the decedent understood the nature and consequences of making the will, the nature and extent of his or her property, and the natural objects of his or her bounty (see Matter of Kumstar, 66 NY2d 691, 692 [1985], Matter of Falkowsky, 197 AD3d 1300 [2d Dept 2021]; Matter of Bux, NYLJ, Dec. 17, 2021 at 17).

The objectant bears the burden of establishing that the will was procured as a result of undue influence exercised over the decedent (see Matter of Nurse, 160 AD3d 745 [2nd Dept 2018]). To establish undue influence, facts must be sufficiently set forth to show that the influencing party had a motive to influence, and that such influence was actually exercised (see Matter of Walther, 6 NY2d 49 [1959]; Matter of Fellows, 16AD3d 995 [3rd Dept 2005]).  In order to demonstrate the existence of a

confidential relationship, there must be evidence of circumstances that demonstrate inequality or a controlling influence (see Matter of Burrows, 203 AD3d 1699 [4th Dept 2022]; Matter of Nurse, 160 AD3d at 745). Where the existence of a confidential relationship is established, the burden shifts to the beneficiary to show that the transaction is fair and free from undue influence (see Matter of Albert, 137 AD3d 1266 [2nd Dept 2016]; Matter of Bartel, 161 Misc 2d 455, 458 [Sur Ct, NY County], aff'd sub nom. Cordovi v Karnbad, 214 AD2d 476 [1st Dept 1995]). Mere speculation and conclusory allegations, without specificity as to precisely where and when the influence was actually exerted, are insufficient to raise an issue of fact (see Matter of Ryan, 34 AD3d 212 [1st Dept 2006], lv denied 8 NY3d 804 [2007]); Matter of Coniglio, 242 AD2d 901 [2nd Dept 1997]).

The objectant likewise has the burden of proof on the issue of fraud and must demonstrate, by clear and convincing evidence, that fraudulent statements were made to the decedent, the proponent knew they were false, and that they caused the decedent to change her will (see Matter of Eastman, 63 AD3d 738 [2nd Dept 2009]; Matter of Gross, 24 AD2d 333, 334 [2nd Dept 1997]).

**Due Execution**

Where, as here, the attorney-draftsperson supervised the will's execution there is a presumption of regularity that the will was properly executed in all respects (see Matter of Kindberg, 207 NY 220 [1912]; Matter of Cottrell, 95 NY 329 1884]; Matter of Finocchio, 270 AD2d 418 [2nd Dept

2000]; see also Matter of Coniglio, 242 AD2d 901 [4[th] Dept 1997]; Matter of Hedges, 100 AD2d 586 [2[nd] Dept 1986], appeal dismissed, 63 NY2d 944 [1984]). The SCPA 1404 testimony of Sheiowitz, who had over 50 years' experience supervising the preparation and execution of testamentary instruments, confirms that, at the time of the will's execution on September 17, 2019, the decedent declared the document to be his last will and testament, signed it in the attorney's presence and requested that the attorney sign as a witness (EPTL 3-2.1 [a] [2] - [4]). This testimony and that of Hillary, the other attesting witness, establish that all formalities of due execution were complied with. The objections consist merely of allegations and present no specifics indicating lack of due execution to rebut that presumption. Accordingly, Christopher has met his burden concerning due execution.

**Testamentary Capacity**

In addition to due execution, the proponent must also establish that the decedent possessed testamentary capacity by demonstrating that the decedent understood the nature and consequences of making the will, the nature and extent of his or her property and the natural objects of his or her bounty (see Matter of Kumstar, 66 NY2d 691 [1985]; Matter of Falkowsky, 197 AD3d 1300 [2[nd] Dept 2021]). The SCPA 1404 testimony establishes that the will was prepared over the course of several months utilizing the information provided by the decedent. Specifically, the decedent accurately informed Sheiowitz that his assets consisted of the bread route

and several pieces of realty, of which he might only have a fractional interest and at least one of which might be in foreclosure. The decedent also acknowledged at all relevant times that his distributees were a spouse from whom he was estranged and the two sons and that he was adamant that Christopher was to be the sole testamentary beneficiary and Irene and Joseph Jr. were not to receive anything.

It is uncontroverted that the decedent was hospitalized with terminal cancer when the will was executed in the late morning of September 17, 2019. The notes of The Hebrew Home medical staff indicate that, at various times on that date, the decedent had "on and off mental status, vascular dementia with depression." Dr. Goldstein notes at 3:48 p.m. that the decedent was oriented as to place and time, but his attention, concentration, insight and judgment were impaired." In contrast, Nurse Sewell reports at 9:55 p.m. that evening "patient alert and oriented, refused medications including Oxycodone, patient states that medication makes him hallucinate." There is nothing in the medical notes or SCPA 1404 examination transcripts that the decedent was sedated, lethargic or lacked understanding at the time the will was executed. Moreover, even if the decedent's health was in decline, "old age, physical weakness or even senile dementia" do not disqualify an individual from executing a will as long as the testator was acting rationally when he executed the will (see Matter of Hedges, 100 AD3d 586 [2d Dept 1984]; Matter of Luther, NYLJ, Jan. 24, 2024 at 9, col 3 [Sur Ct, NY County 2024]).

Significantly, both Sheiowitz and Hillary testified that they went to The Hebrew Home in the late morning of September 17, 2019 to have the will executed. After checking in, they went upstairs and Dr. Sulekha, the decedent's treating physician, greeted them outside the decedent's room, remarked that "he's lucid" and ushered them inside. The testimony establishes that the decedent knew that they came to have his will executed, remained alert during the entire time they were there and read each page of the instrument prior to signing it. The testimony that they would not have proceeded had the decedent exhibited lack of testamentary capacity and their signatures on a self-proving affidavit corroborating the same also provide the basis upon which to establish a prima facie case for testamentary capacity (see Matter of McCarthy, 269 AD145 [1st Dept 1045]; affd 296 NY 987 [1947]; Matter of Peragine, NYLJ Jul. 17, 2023 at 20, col 3 [Sur Ct, NY County 2023]).

Although the notes of The Hebrew Home staff and several relatives of the decedent depict the decedent as depressed and disoriented at various times, Joseph Jr. did not submit any evidence in admissible form to create an issue of fact as to decedent's lack of testamentary at the time he executed the will. Based upon the testimony and medical evidence submitted as noted hereinabove, Christopher has met his burden of demonstrating that the decedent possessed testamentary capacity when the propounded instrument was executed.

**Undue Influence and Fraud**

To establish undue influence, facts must be sufficiently set forth to show that the influencing party had a motive to influence, and that such influence was actually exercised (see Matter of Walther, 6 NY2d 49 [1959]; Matter of Aoki, 99 AD3d 253 [1st Dept 2012]). Since the actual exercise of undue influence is difficult to prove, undue influence is proven by circumstantial evidence, such as: (1) the testator's physical and mental condition; (2) whether the attorney who drafted the instrument was the testator's attorney or was associated with the beneficiary; (3) whether the beneficiary had a direct involvement in the preparation or execution of the instrument; (4) whether the propounded instrument deviates from the testator's prior dispositive plan; (5) whether the person who allegedly wielded undue influence was in a position of trust; and (6) whether the testator was isolated from the natural objects of his affection (see Matter of Luther, NYLJ, Jan. 24, 2024 at 9 col 3 [Sur Ct, NY County 2024]; Matter of Roberts, 34 Misc. 3d 1213 [A], 2011 NY Slip Op 52472 [U] [Sur Ct, NY County 2011]).

> "Where there is a confidential relationship between the grantor/testator and a beneficiary in a transaction such that they were dealing on unequal terms due to one party's weakness, dependence or trust justifiably reposed upon the other and unfair advantage is rendered probable, the burden of proof with respect to allegations of undue influence will be shifted to the stronger party to show, by clear and convincing evidence, that no undue influence was used. In determining whether a confidential relationship exists, the existence of a family relationship does not, per se, create a presumption of undue influence: there must be evidence of other facts or circumstances showing inequality or controlling influence. The existence of such a relationship will ordinarily be a question of fact (see Matter of Rozof, 219 AD3d 1428 [2nd Dept. 2023]; Matter of Neumann, 210 AD3d 492 [1st Dept. 2022]; Matter of

Nealon, 104 AD3d 1088 [3rd Dept 2013], affd 22 NY3d 1045 [2014])."

Notably, the evidence suggests that the decedent's relatives and friends are split into Christopher and Joseph Jr. "camps." Christopher, Irene and Alexander opine that the decedent was resolute about disinheriting Joseph Jr. because of felony convictions, paying over $100,000 for his legal defense and the litigation concerning the Rockland County Realty. They also allege that Joseph Jr. was estranged from the decedent for over 10 years and during most of his final illness. They depict Joseph Jr. only as a liability, and that the decedent had essentially given up on him.

In contrast, Joseph Jr., the former spouse, the two nieces and employees at the bread route maintain that the decedent had a loving relationship with Joseph Jr., who they maintain financially salvaged the bread route for the decedent and also actively worked the route during the decedent's incapacities. The former spouse also refutes the claims that the decedent was estranged from Joseph Jr. and paid his significant legal costs, since it was she who paid most of Joseph Jr.'s legal bills and took out a mortgage on her home to do so. The former spouse also alleges that the decedent went with her many times to visit Joseph Jr. after he was incarcerated and expressed love for him during the visits. The decedent's brother Michael Bux, the two nieces and the nephew also aver that it was Joseph Jr. who helped out the decedent and the decedent's mother, and the decedent continued to express love for Joseph Jr. This belies the testimony

of Christopher and the other brother Alexander, that Joseph Jr. neglected the decedent and the decedent's mother at the end of their lives.

Sheiowitz' testimony establishes that he was retained directly by the decedent and Christopher did not participate in the will planning. Although a power of attorney was executed along with the will there is no showing that it was actually exercised. These facts standing alone would not support an inference that Christopher had a confidential relationship with the decedent. Moreover, evidence that the decedent exercised some control over his financial affairs is not dispositive whether his actions were taken free of improper influence and manipulation (see Matter of Kotsones, 37 NY2d 1154 [2022]; Rollwagen v Rollwagen, 63 NY 504[1876]).

However, the SCPA 1404 testimony and the documents demonstrate that Christopher was in charge of the decedent's care at The Hebrew Home during the relevant times and he had a long standing animosity towards Joseph Jr. dating from childhood. Although Christopher submits a list of alleged authorized visitors at the Hebrew Home for the week prior to the date of death, there is no corroboration that these persons were allowed to visit. Significantly, there is testimony from several of those same individuals that they were, in fact, prevented from visiting the decedent during this time period. The consistent testimony of Joseph Jr. as well as that of the former spouse, friend/caretaker, the two nieces and the decedent's other brother, Michael Bux, that the decedent continued to express love for Joseph Jr. and that they were excluded from The Hebrew Home by

Christopher beginning several weeks prior to the date of execution and continuing until his death, create triable issues of fact as to whether Christopher controlled access to the decedent at the end of his life in order to be designated sole testamentary beneficiary.

On this state of the record, Joseph Jr. is entitled to have the jury consider his objections concerning undue influence and the evidence regarding whether Christopher had a confidential relationship with the decedent, the decedent's relationship with Joseph Jr., whether Christopher utilized undue influence and, if so, did the decedent exercise free will when executing the testamentary instrument (see Matter of Walther, 6 NY2d at 49; Matter of Nealon, 104 AD3d 1088 [3rd Dept 2013]; Matter of Williams, 172 AD3d 514 [1st Dept 2019]).  The court and jury should also be afforded the opportunity to see and hear the witnesses and consider their demeanor in order to assess their credibility (see Matter of Kosones, 37 NY at 1154).

At this time, there is no overt showing on the submissions of fraud and duress.  However, given the statements of Christopher, Alexander and Irene, juxtaposed with the allegations of lack of contact and access by Joseph Jr., the former spouse, caretaker, nieces and nephews, there exist issues of fact concerning whether fraud was employed by Christopher upon the decedent given his end of life physical and mental condition concerning his relationships with Joseph Jr. and other family members warranting determination by a jury.

**CONCLUSION**

On this state of the record, for the reasons stated hereinabove, this decision constitutes the order of the court granting summary judgment in favor of Christopher dismissing Joseph Jr.'s objections as follows: Objection No. 1 as to lack of testamentary capacity; Objection No. 2 as to lack of due execution, and that branch of Objection No. 3 alleging duress and mistaken understanding as to the import of the terms of the will. Summary judgment seeking to dismiss the remaining branches of Objection No. 3 sounding in fraud and undue influence is denied, as is Objection No. 4 with respect to an alleged confidential relationship.

The matter shall appear on the court's pre-trial calendar on January 21, 2025 at 9:30a.m. The parties and Christopher's attorney shall appear and be prepared to discuss the issues to be presented, the witnesses expected to testify, documents to be admitted into evidence and the filing of the note of issue, certificate of readiness and statement of the issues (see Uniform Rules for Surrogate's Court [22 NYCRR] §§ 207.29 and 207.30).

The Chief Clerk shall mail a copy of this decision and order to counsel for Christopher and to Joseph Bux Jr.

_____
HON. NELIDA MALAVÉ-GONZALEZ
SURROGATE